ATCHISON, T. & S. F. RY. CO. et al. v. INTERSTATE COMMERCE COMMISSION et al.

(Commerce Court.  July 20, 1911.)

**1.** Carriers (§ 84*)—Delivery of Freight—What Constitutes.

The common-law rule that, in the absence of a special contract or usage to the contrary, common carriers by land are bound to deliver or tender goods to the consignee at his residence or place of business, has never been applied to railroads, which are exempt from the duty of personal delivery, and are bound only to carry the goods to the depot or station to which they are destined, and there hold or place them in a warehouse ready for delivery on demand of the consignee after notifying him of their readiness to deliver.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 290–298; Dec. Dig. § 84.*]

**2.** Commerce (§ 95*)—Rates—Switching Charge—Findings of Interstate Commerce Commission—Review.

A finding by the Interstate Commerce Commission that a carrier's charge for delivering and receiving car load freight to and from industry

tracks when such freight was moving in interstate commerce was a mere incident to a system-line haul, and was in violation of the interstate commerce act (Act June 18, 1910, c. 309, 36 Stat. 539), was a conclusion of law and open to inquiry by the Commerce Court.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 95.*]

3. COMMERCE (§ 91*)—INTERSTATE COMMERCE—COMMERCE COURT—RULINGS OF INTERSTATE COMMERCE COMMISSION—REVIEW.

The Commerce Court, in examining the report of the Interstate Commerce Commission, to ascertain the particular provisions of the interstate commerce act (Act June 18, 1910, c. 309, 36 Stat. 539), relied on to sustain a particular order, is limited to the report of the majority of the Commission, the views of the minority not being open to consideration.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 91.*]

4. COMMERCE (§ 95*)—INTERSTATE COMMERCE—RULINGS OF COMMISSION—REVIEW.

Where a rule of the Interstate Commerce Commission that a carrier's charge for receiving and delivering car load freight to and from industry tracks was illegal and unjust was based on findings on admitted facts, that the industry track was a terminal facility of the railroad, and that the service was the same service as that which the carrier performed in delivering freight at its depot or team tracks, such ruling was not conclusive on the Commerce Court, which had power to form an independent judgment on the facts admitted.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 95.*]

5. CARRIERS (§ 26*)—FREIGHT—RATES—SWITCHING CHARGE.

Transportation of cars and freight intended for interstate commerce to and from industrial plants located from one-fifth of a mile to seven miles from the main track of the carrier is not the same service which the carrier performs when it delivers freight at its depot or team tracks, the carrier being bound to perform such industrial track service, in the absence of statute, only under an arrangement with the owner of the industrial plant, for which it may charge a reasonable compensation.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 26.*]

6. CARRIERS (§ 26*)—INTERSTATE FREIGHT—TRAFFIC RATES—DELIVERY CHARGE.

Under the facts in this case the general traffic rate for interstate freight does not include delivery to an industrial plant of the consignee or the transportation of the cars from the industrial plant of the shipper to the carrier's yard or main line over a distance varying from one-fifth of a mile to seven miles, but the carrier performing such service is entitled to exact a reasonable charge therefor.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 26.*]

Mack, Judge, dissenting.

Bill by the Atchison, Topeka & Santa Fé Railway Company and others against the Interstate Commerce Commission and another. On motion for a temporary injunction against the enforcement of an order of the Interstate Commerce Commission, prohibiting a charge for switching service on cars delivered on industry tracks. Motion to dismiss bill denied, and temporary injunction granted.

Robert Dunlap, T. J. Norton, F. C. Dillard, H. A. Scandrett, and C. W. Durbrow (Gardner Lathrop and W. F. Herrin, of counsel), for petitioners.

J. A. Fowler, Asst. Atty. Gen., Blackburn Esterline, Sp. Asst. Atty. Gen., and P. J. Farrell, for respondent Interstate Commerce Commission.

Seth Mann, for interveners.

Before KNAPP, Presiding Judge, and ARCHBALD, HUNT, CARLAND, and MACK, Associate Judges.

CARLAND, Judge.   This case has been submitted upon a motion for a temporary injunction made by the petitioners, and upon a motion to dismiss made by the United States and the Interstate Commerce Commission.   The motion to dismiss is made by virtue of the provisions of section 1 of the act to create a Commerce Court (Act June 18, 1910, c. 309, 36 Stat. 539), which allows such a motion to be made where it is claimed the petition does not set forth a cause of action.   As determinative of these motions, our view is necessarily limited to the facts which are well pleaded in the petition.   These facts, as they appear in the petition, are substantially as follows:

"The petitioners are railroad corporations, organized under the laws of the states of Kansas, Kentucky, and Utah, respectively.   At all times each of said petitioners, and their respective predecessors in interest have maintained and do now maintain public freight depot buildings theretofore, respectively, established by them in said city of Los Angeles upon or adjacent to their respective tracks connecting with their respective main tracks in said city, where freight in less than car load lots is and has been received for transportation for shippers in said city, destined to various points upon their respective lines of railroad or points upon connecting lines of railroad in the United States, and where such freight transported from various points to Los Angeles is delivered to the owners or consignees thereof.

Each of said petitioners and their respective predecessors in interest have also located and established and have maintained and do now maintain what are known as "team tracks" and freight sheds connected with their respective main tracks in said city of Los Angeles where cars are set for the accommodation of the public in general for the loading therein of car load freight for transportation to various points upon their respective lines of railroad in the United States, and where, also, is set and placed for the unloading thereof by consignees or owners in said city, who have not been favored with the private or special side-track facilities hereinafter mentioned, car load freight consigned and transported from various points on their respective lines of railroad or points on other lines of railroad in the United States or elsewhere to such owners or consignees in said city of Los Angeles; and said team tracks and freight sheds are so connected with the respective main line tracks of the petitioners in said city that cars loaded with car load freight may be readily transferred from said main line tracks to said team tracks and sheds, and where empty cars intended to be loaded with car load freight for transportation may be set and readily transferred when loaded from said places to the tracks upon which trains are made up; and the said team tracks and freight sheds constitute and have constituted the places where the respective petitioners receive and have heretofore received and have delivered and do now make deliveries of car load freight from and to the public in general in the said city of Los Angeles; and the same are and have been

in all respects sufficient and adequate for and fully accommodate those desiring such service.

Said main tracks, team tracks, sheds, and buildings above shown constitute the places established as depots or stations by each of the petitioners in said city of Los Angeles for the receipt, handling, and delivery of car load and less than car load freight intrastate and interstate. Said facilities so established and maintained for the receipt, handling, and delivery of less than car load freight are sufficient for the handling of double the amount of such freight that has been tendered, is tendered, or at any day can be tendered. The freight sheds and team tracks, established and maintained for the receipt, handling, and delivery of car load freight, are sufficient to handle all the car load freight coming into or shipped from said city, either for delivery on said team tracks or for delivery on any of the industrial tracks. Said sheds and team tracks so maintained and established are sufficient to handle more than double the number of car loads of freight coming into or going out of Los Angeles, whether originating on or destined to said team tracks, or originating at or destined to the industrial tracks hereinafter referred to; and on said team tracks and at said sheds without inconvenience to them more than double the amount of all car load freight can be received, handled, and delivered. In addition to this, each of petitioners has in connection with its said depots or stations a considerable amount of vacant land upon which it can and will as the requirements of the public may demand place other sheds and team tracks; so that there is no necessity in the proper conduct of petitioners' business or in the rendering of proper service to shippers in said city to have or maintain the industrial tracks hereinafter referred to. But for the accommodation of certain shippers and for their benefit in loading and unloading, shipping and receiving freight, and to save them the expense of cartage which they otherwise would have to pay, and which is paid by the public not favored with industrial tracks, industrial tracks have been built as hereinafter more fully set forth.

Each of the petitioners, as well as their respective predecessors in interest, have heretofore severally or individually entered into contracts or agreements with certain individual shippers in Los Angeles or with parties who had constructed or were contemplating the construction and operation of plants or industries in said city, for the construction of spur tracks from the respective plant or industry in said city to and connecting with the yard tracks of the respective petitioners in said city where trains of cars are made up or distributed, a part of the cost of such spur track being generally borne by the railway company and a part of such shipper. But such tracks were constructed especially to accommodate the plant or industry in question and to relieve the owner or operator thereof from the necessity of receiving at or delivering to the team tracks of the respective petitioners car load freight consigned to or shipped by the owner or operator of said plant, and therefrom and thereby the owner or operator of such plant or industry located upon such spur or side track was re-

lieved from the necessity of transferring car load freight to and from said team tracks and from or to such plant or industry by dray or wagon at a higher cost and greater risk; and that the shipper at such industry or plant by reason of such side-track facilities is given or accorded a decided advantage over other shippers in Los Angeles who were not favored with such spur tracks.

In such contracts it was generally stated that at the request of the shipper or owner of the proposed plant the railway company would construct and maintain for a limited number of years, usually less than five, a spur track to connect such plant or industry with the railroad of the railway company. But in such contracts it was generally provided that while the railway company might make use of the proposed track for its incidental purposes such use should not interfere with the movement or use thereon of cars switched to or from such plant or industry, but that the traffic to and from such plant or industry should be given a preferential right in the use of such tracks.

In the contracts made by the Southern Pacific Company covering the construction and maintenance of such industrial or spur tracks it was generally provided, among other things, as follows:

"(1) Undersigned (shipper) will pay cost of constructing above-described track (rails, splices, bolts. switches, frogs, switch stands, and connections to be furnished by and at the cost of Southern Pacific Company), whether such cost may be more or less than amount of foregoing approximate estimate.

"(2) Said track shall be under full control of Southern Pacific Company and may be used at discretion of said company for shipments or delivery of any freight. but the business of the undersigned shall always have preference.

"(3) All material in said track furnished at expense of Southern Pacific Company, whether in original construction or by any way of replacements or repairs, shall be and remain exclusive property of Southern Pacific Company. and said Southern Pacific Company shall keep said track in repair.

"(4) In case said track shall not be used by undersigned for period of one year, said Southern Pacific Company may. at its option, remove said track.

"(5) All goods shipped from or to said track by rail, routing of which is controlled. or may be reasonably held to be controlled. by or through undersigned. shall. when forwarded. be over such railroads as may be selected by Southern Pacific Company, provided rate of charge shall be as low as that from or to point in question by any other rail route."

The contracts made for such purposes by the Atchison, Topeka & Santa Fé Railway Company contained among other things the following provisions:

"The title to said track, and to all the rails, ties, bolts, switches, fastenings, and fixtures connected therewith. and to all other property which may be furnished by the railway company in the maintenance of said track, shall at all times be and remain in said railway company, and said railway company may use the same for other purposes than the delivery of freight to or the receipt of freight from the second party, provided that such use shall inconvenience the business of the second party as little as possible consistent therewith; and at any time after the termination of this contract or the obligation of the railway company. as herein provided, to maintain such track, the railway company shall have the right to remove said track and every part thereof."

The contracts made by the San Pedro, Los Angeles & Salt Lake Railroad Company covering the cost and maintenance of such spur

or industrial tracks contained provisions similar to those of the Southern Pacific Company above set forth.

Industries or plants in said city of Los Angeles located upon spur tracks heretofore constructed under contract, as aforesaid, by the Atchison, Topeka & Santa Fé Railway Company, or its predecessors in interest, in said city of Los Angeles, are distant from its main track in said city anywhere from one-fifth to one and a half miles, and in order to receive a car load of freight from such plant or industry it will be as it has been necessary to switch from the main track or yards of the said petitioner an empty car and set the same at such industry where the same can be conveniently loaded by the shipper, and such car when loaded must then be switched over such spur track and to the yard tracks to be placed in an appropriate train for transportation to destination; and where a car load of freight is consigned to the operator of such plant or industry it is and has been necessary to switch the same from the yards of said petitioner over said spur to the industry or plant in question and to place the same conveniently thereat for unloading, and in many instances the empty car is required to be switched or transferred in being returned from such plant to the general yards of petitioner.

Industries or plants in the said city of Los Angeles located upon the spur tracks heretofore constructed under contract as aforesaid by the Southern Pacific Company or its predecessor in interest in said city of Los Angeles are distant from its main track in said city anywhere from 200 feet to 7 miles, and in order to receive a car load of freight from such plant or industry it will be as it has been necessary to switch from the main track or yards of said petitioner any empty car and set the same at such industry where the same can be conveniently loaded by the shipper, and such car when loaded must then be switched over such spur track and to the yard tracks to be placed in an appropriate train for transportation to destination; and where a car load of freight is consigned to the operator of such plant or industry it is and has been necessary to switch the same from the yards of said petitioner over said spur to the industry or plant in question and to place the same conveniently thereat for unloading, and in many instances the empty car is required to be switched or transferred in being returned from such plant to the general yards of petitioner.

Industries or plants in said city of Los Angeles located upon spur tracks heretofore constructed under contract as aforesaid by the San Pedro, Los Angeles & Salt Lake Railroad Company in said city are distant from its main track in said city anywhere from one-fifth to four miles, and in order to receive a car load of freight from said plant or industry it will be as it has been necessary to switch from the main track or yards of said petitioner an empty car and set the same at such industry where the same can be conveniently loaded by the shipper, and such car when loaded must then be switched over such spur track and to the yard tracks to be placed in an appropriate train for transportation to destination; and where a car load of freight is consigned to the operator of such plant or industry it is and has been necessary to switch the same from the yards of said petitioner over

said spur track to the industry or plant in question, and to place the same convenient thereat for unloading, and in many instances the empty car is required to be switched or transferred in being returned from such plant to the general yards of petitioner.

In such contracts governing the construction and maintenance of such industrial tracks no specific sum was fixed or prescribed in case the railway company should perform the aforesaid special service of receiving or delivering freight at the plant or industry in question, but at the time of executing such contract the usual charge separately and specially set forth in the respective tariffs of petitioners for making such special deliveries or such special receipt of such car load freight, involving the switching service to and from such plant or industry from and to the yards of respective petitioners where trains are made or broken up, had been generally established by each petitioner at the sum or price of $2.50 per car, and had for many years and since the installation of industry tracks in said city been paid by the shippers using such tracks, and at the time of making such special agreements shippers entering into the same understood and willingly consented that if the railway company performed such special service a charge therefor in addition to the freight rate from and to Los Angeles would be made, and such charge of $2.50 per car has generally been made, maintained, and collected from said shippers in Los Angeles for said special service as aforesaid.

The aforesaid service heretofore rendered by the respective railway companies of receiving car load freight at said industries or delivering the same to such industries or plants instead of at the team tracks or sheds is of great value to the owners or operators of such industries or plants, and is worth much more than the sum of $2.50 per car, inas-much as a great saving is made by such industries by reason of being relieved of the necessity of paying drayage or other charges which would be involved in the receipt or delivery of car load freight at the team tracks or sheds, and risk of damage to such freight is materially lessened, and shippers who have been thus favored by the construction under special agreement of such spur tracks to and from their industries and by the receipt and delivery of freight thereat are greatly favored and are and have been accorded a decided advantage over other shippers in said city with whom such contracts have not been made or entered into. The general or prevailing charge for drayage in Los Angeles is 50 cents a ton, which makes the cost to the consignee $7.50 on a car load of 15 tons, $10 on a car load of 20 tons, $15 on a car load of 30 tons, $20 on a car load of 40 tons, $25 on a car load of 50 tons, and so on, as against the charge of $2.50 imposed by petitioners for delivering the consignment to or receiving the shipment at the door of the consignee's or shipper's warehouse.

In performing said special switching service involved in the receipt and delivery of car load freight at such industry or plant, petitioners are put to a much greater expense than if such freight was received or delivered on its team tracks or at its freight sheds.

Each of petitioners has made and established its rates of transportation to and from said city of Los Angeles from and to such points

on their respective lines, and in many instances joint rates from and to points on many other railroads in the United States; they have duly published and filed with the Interstate Commerce Commission and posted in their respective stations where freight is received their respective schedules or tariffs of rates governing or concerning interstate transportation of freight in which rates are prescribed for less than car load lots and for car load freight; and in respect to less than car load freight the rates have been established and made to cover the receipt or delivery of such freight at the freight station of the respective railway company in said city; and in respect to car load freight rates established for the public in general contemplate receipt or delivery thereof upon or at the team tracks or sheds of the respective railway company; and in said tariffs it has been and is distinctly and separately provided and stated that where car load freight is received at or delivered to private industries located upon such industry tracks in said city of Los Angeles an additional charge—that is, a charge in addition to the rate fixed to and from Los Angeles, amounting to $2.50 per car—will be charged and collected for said special service of making delivery or receipt of car load freight to or at said plants or industries located in said city of Los Angeles upon such special industry tracks.

On account of water and other competition the rates of transportation to and from Los Angeles have been forced to an exceedingly low basis so that petitioners do not receive for such transportation sums which they are justly entitled to and which they would otherwise be able to charge and collect.

On or about April 5, 1910, the Interstate Commerce Commission, having investigated the complaint of the Associated Jobbers of Los Angeles against petitioners wherein said charge of $2.50 per car was claimed to be unjust and illegal, made the following order:

"This case being at issue on complaint and answers on file and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been had, and the commission having, on the date hereof, made and filed a report containing its findings of fact and conclusions thereon, which said report is hereby referred to and made a part hereof, and having found that the present charge of $2.50 per car exacted by the several defendants for delivering and receiving car load freight to and from industries located upon spurs and side tracks within their respective switching limits at Los Angeles, Cal., when such car load freight is moving in interstate commerce incidentally to a system-line haul, is in violation of the act to regulate commerce:

"It is ordered that said defendants be, and they are hereby, notified and required to cease and desist, on or before the 1st day of July, 1910, and for a period of not less than two years thereafter abstain, from exacting their present charge of $2.50 per car for delivering and receiving car load freight to and from industries located upon spurs and side tracks within their respective switching limits in the said city of Los Angeles, Cal., when such car load freight is moving in interstate commerce incidentally to a system-line haul.

"It is further ordered that said defendants be, and they are hereby, notified and required to cease and desist. on or before the 1st day of July, 1910, and for a period of not less than two years thereafter abstain, from exacting any charge whatever. other than the charge for transportation from points of origin to destination; for delivering or receiving car load freight to or from industries located upon spurs or side tracks within their respective·

switching limits in the said city of Los Angeles, Cal., when such car load freight is moving in interstate commerce incidentally to a system-line haul."

Petitioners complain that said order deprives them of all compensation for the said special services so rendered by them respectively, and that said order is by reason thereof illegal and void. The petition prays that said order be annulled and that the Interstate Commerce Commission be perpetually enjoined from the enforcement thereof.

[1] Whether or not the facts stated in the petition constitute a cause of action depends upon the question whether the petitioners have the lawful right to make the charge of $2.50 per car for the industrial track service mentioned. In the absence of special contract or usage to the contrary, under the common law carriers by land are bound to deliver or tender goods to the consignee at his residence or place of business, and until this is done they are not relieved from responsibility as carriers. This rule, however, never was applied to railroads. They are exempt from the duty of personal delivery, and bound only to carry the goods to the depot or station to which they are destined and there hold or place them in a warehouse ready for delivery whenever the consignee or owner calls for them, after notifying the consignee or owner of their readiness to deliver. Fenner v. Buffalo, etc., R. Co., 44 N. Y. 505, 4 Am. Rep. 709; Witbeck v. Holland, 45 N. Y. 13, 6 Am. Rep. 23; Chalk v. Charlotte, etc., R. Co., 85 N. C. 423; South, etc., Alabama R. Co. v. Wood, 66 Ala. 167, 41 Am. Rep. 749; New Orleans, etc., R. Co. v. Tyson, 46 Miss. 729; State v. Republican Valley R. Co., 17 Neb. 647, 24 N. W. 329, 52 Am. Rep. 424; Francis v. Dubuque, etc., R. Co., 25 Iowa, 60, 95 Am. Dec. 769; Evershed v. London, etc., R. Co., 2 Q. B. Div. 254.

The order of the Interstate Commerce Commission complained of makes the report of the commission a part thereof and as said order is set out in the petition the report also becomes a part of said petition.

[2] It is found in the order of the commission that the charge of $2.50 per car exacted by the several petitioners for delivering and receiving car load freight to and from industries located upon spurs and side tracks within their respective switching limits at Los Angeles, Cal., when such car load freight is moving in interstate commerce incidentally to a system-line haul is in violation of the act to regulate commerce. This conclusion is a conclusion of law, and of course is open to inquiry in this court. It is not stated in the order itself what particular section of the act to regulate commerce the charge of $2.50 per car for the services rendered by petitioners violates, but as the report of the commission is made a part of the order we are at liberty to examine said report with a view of ascertaining the views of the commission as to what particular provision of the act to regulate commerce the practice or charge of petitioners violates.

[3] In this examination we are limited to the report or opinion of the majority of the commission, the views of the minority not being open to consideration. Interstate Commerce Commission v. Delaware, L. & W. R. R. Co., 220 U. S. 235, 31 Sup. Ct. 392, 55 L. Ed. ——.

In the report of the commission we find the following language (18 Interst. Com. R. 310): ·

"The basic theory of the complainant's case is that these industry spurs are part of the receiving and delivering systems of the carriers, which theory is met by the defendants with the proposition that these spurs are essentially plant facilities constructed for the convenience of the shipper rather than that of the carrier. In a sense and within proper limitations both of these contentions are sound."

Again, it is said in the report as follows:

"We are fully convinced that the complainant's view of the nature of these tracks is correct, and that they are portions of the terminal facilities of the carrier with whose lines they connect, and, together with the team tracks and other yards, form the terminal facilities of these carriers."

It is also stated in said report:

"We do not find in the record sufficient data upon which to base a finding as to the reasonableness of the amount of this charge of $2.50 for interline switching to these industrial tracks, and for the purpose of this present order will assume it to be reasonable."

Again, quoting from the report:

"The service here under consideration, however, is a delivery service and nothing more; the delivery being made at one of the carrier's tracks which is removed at a greater or less distance from its public yards. Spur track delivery is a substitute service, a service which it has solicited the right to give, as the evidence here shows, a service which costs the industry for the installation of the track and the use of its property as a railway terminal. It is a service over the carrier's own rails to a point where it yields possession of the property transported and which involves no greater expense than would team track delivery. It relieves the carrier's team tracks and sheds, necessitating less outlay for expense of yards in a crowded city, promotes the speedy release of equipment, and vastly aids in conducting a commerce which is greater than the carrier's own facilities could freely, adequately, and economically handle."

The commission condemned the charge of $2.50 per car made by the petitioners for delivering and receiving interstate car load freight to and from industries located upon spurs or side tracks within their respective switching limits when such car load freight was moving incidentally to a system-line haul as illegal and unjust. As the commission did not find the charge of $2.50 to be excessive in and of itself, we conclude that the commission found that the charge violated section 1 of the act to regulate commerce, the charge being unjust because on the theory of the report of the commission the carrier had already been paid for this service by payment of the regular tariff from point of origin to destination.

[4] It is claimed by counsel for the United States, under the decisions of the Supreme Court in Interstate Commerce Commission v. Illinois Central R. R. Co., 215 U. S. 452, 30 Sup. Ct. 155, 54 L. Ed. 280, Baltimore & Ohio R. R. Co. v. Pitcairn, 215 U. S. 481, 30 Sup. Ct. 164, 54 L. Ed. 292, and Interstate Commerce Commission v. Delaware, L. & W. Ry. Co., 220 U. S. 235, 31 Sup. Ct. 392, 55 L. Ed. ——, that the findings thus made by the commission are conclusive upon this court, and that these findings forming a part of the petition, it

conclusively appears therefrom that no cause of action has been stated which would warrant this court, taking all the allegations of the petition as true, in granting the relief prayed for. We are not unmindful of the rulings of the Supreme Court in the cases mentioned in regard to the force and effect to be given to the findings of the commission and have no disposition in any way to avoid the binding force of such rulings. We think that it is fair to say that the conclusion of the commission that the charge of $2.50 per car for the service named was illegal and unjust was based upon two findings: First, that the industrial track upon which the service was rendered is a terminal facility of the railroad and not a plant facility of the industry to which it leads; and, second, that the service for which the charge is made is the same service as that which is performed by the carrier in delivering freight at its depot or team tracks.

We do not think that whether the industrial track is a plant facility or a terminal facility of the railroad necessarily determines the legality of the charge. The commission, in one part of its report, found that the contentions of both parties within certain limits were sound. The real question presented is, "Is the carrier lawfully entitled to charge the sum of $2.50 per car for the service performed upon the industrial tracks?" and we do not think that question can be determined alone by the consideration whether the industrial track is a plant facility or a terminal facility of the railroad, for the reason that it is the service which is performed upon the industrial track that is the question, regardless of the ownership of the track.

So far as the finding of the commission that the industrial track service is the same as the team track or depot service is concerned, we are constrained to hold that it is not a finding which precludes this court from coming to a different conclusion upon the present record. In cases where there is a substantial conflict in the evidence or testimony upon which a finding of the commission is based, we would feel bound by the finding unless clearly and palpably against the weight of the testimony; but we do not think that this court is concluded by a finding of the commission based upon admitted facts which in no wise tend to sustain the conclusion reached. In other words, as in this case, where all the facts are undisputed, we do not think that the commission can by an ultimate finding based upon the undisputed facts preclude this court from reaching a conclusion of its own upon such undisputed and admitted facts. Where the facts are undisputed there is no occasion for facts to be found, and the ultimate conclusion of the commission is a mixed question of law and fact which certainly ought not to be held to be conclusive upon this court.

[5] To say that the transportation of cars and freight to and from industrial plants located from one-fifth of a mile to seven miles from the main track of the carrier is the same service which the carrier performs and for which it is paid by the general tariff charge when it delivers freight at its depot in Los Angeles, or at the team tracks, is so contrary to the admitted physical facts as to be wholly untenable. It

seems clear to us that in the absence of statute the carriers in the present case are not bound to perform this industrial track service and if they voluntarily perform it under an arrangement with the owner of the industrial plant, we see no reason why they may not charge a reasonable price therefor, and the charge in question is conceded to be reasonable.

[6] We are not at liberty to view the case at this time except as it appears from the petition, and we are wholly unable to come to the conclusion from the facts therein stated, which are to be taken as admitted for the purpose of this motion, that the industrial or spur track service is the same service that the carrier performs by delivery to the team track or at the depot, and therefore are unable to say that the general tariff charge on freight shipped to Los Angeles from points of origin would include a delivery at the industrial plant. Nor are we able to see how it can be said that the general tariff charge includes a delivery at the industrial plant. When it is said that the general tariff charge for the transportation of freight to Los Angeles pays for the delivery of such freight at the industrial plant, upon what authority is this declaration made? Who is to say that it pays for delivery at the industrial plant? The carrier, in the first instance, is entitled to fix its tariff charges for the transportation of freight, and in this instance has fixed a certain tariff for the delivery of freight to Los Angeles. At the same time that it fixed this general tariff it fixed a tariff, which it filed with the Interstate Commerce Commission, for this industrial track service, so that the only party in the first instance that had anything to say about what the general tariff charge should be was the carrier, and it has said that the general tariff charge only carries the freight to the depot or the team tracks. There is no evidence whatever that the carrier ever waived in any way its right to charge for the special service on the industrial tracks. There may be conditions under which the carrier may waive its right to make a charge for terminal service, as was said in Interstate Commerce Commission v. Stickney, 215 U. S. 105, 30 Sup. Ct. 67 (54 L. Ed. 112):

"The carrier is under no obligation to charge for terminal services. Business interests may justify it in waiving any such charge, and it will be considered to have waived it unless it makes plain to both shipper and commission that it is insisting upon it."

The petition in the present case shows that before these tracks were constructed this charge was contained in the general tariffs of petitioners and that said charge for industrial track service was known to the different proprietors and owners of industrial plants, and that they consented to such charge. It is admitted of course that such consent or implied contract on the part of the industrial plant owners would be avoided if it was in conflict with any law of Congress regulating interstate commerce. If the carrier is not bound by law to deliver freight at the industrial plant, and it cannot be successfully contended that it is, then it follows as a necessary consequence that this industrial track service is a special service and is not a service which the carrier is bound to perform for the general tariff charge for the transportation of freight destined to Los Angeles.

The commission made no finding that the charge of $2.50 in connection with the transportation of cars to and from industrial plants constituted an undue preference or advantage or was discriminatory in any way, and these questions if they exist at all will not be discussed.

From what has been stated in this opinion as the views of this court, it necessarily results that the motion to dismiss must be denied, and an order will be granted suspending the order of the Interstate Commerce Commission complained of until the further order of this court.

MACK, Judge, dissents. See 188 Fed. 929.