LOUISVILLE & N. R. CO. et al. (NASHVILLE GRAIN EXCHANGE et al., Interveners) v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).

(Commerce Court. June 7, 1912.)

No. 47.

1. CARRIERS (§ 32*)—INTERSTATE COMMERCE—DISCRIMINATION BETWEEN LO-CALITIES—RESHIPPING PRIVILEGE.

The granting by the Louisville & Nashville Railroad Company and the Nashville, Chattanooga & St. Louis Railway Company, operating lines of railroad from Mississippi and Ohio river points to Nashville, Tenn., and beyond, of the privilege of unloading grain, grain products, and hay shipped from or through such river points at Nashville and reshipping the same for more distant points to the southeast within 6 months at through rates, which rule has been in force for 40 years, *held*, on the undisputed facts, to have been due to, and justified by, competition by water transportation on the Cumberland river from the Ohio, and not to constitute an undue and unreasonable preference and advantage or an undue and unreasonable prejudice and disadvantage as between Nash-ville and points in Georgia, in violation of Interstate Commerce Act Feb. 4, 1887, c. 104, § 3, 24 Stat. 380 (U. S. Comp. St. 1901, p. 3155).

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*

What constitutes an unlawful preference or discrimination by a car-rier under interstate commerce regulation. See note to Gamble-Robin-son Commission Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

2. COMMERCE (§ 95*)—ORDERS OF INTERSTATE COMMERCE COMMISSION—REVIEW.

Where the facts upon which an order of the Interstate Commerce Com-mission is based are either admitted or undisputed, whether or not such facts show a violation of law by a carrier is a question of law, and a finding by the Commission thereon is reviewable by the Commerce Court.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 145; Dec. Dig. § 95.*]

Hunt, Judge, dissenting.

In Equity. Suit by the Louisville & Nashville Railroad Company and the Nashville, Chattanooga & St. Louis Railway Company, pe-titioners, and the Nashville Grain Exchange and the Nashville Board of Trade, intervening petitioners, against the United States, respond-ent, and the Interstate Commerce Commission, W. S. Duncan & Co., and others, intervening respondents, to annul an order of the Inter-state Commerce Commission. On final hearing. Order annulled.

For opinion of the Interstate Commerce Commission, see 21 Interst. Com. Com'n R. 186. See, also, 16 Interst. Com. Com'n R. 590; In re Substitution of Tonnage at Transit Points, 18 Interst. Com. Com'n R. 280.

R. Walton Moore, of Washington, D. C. (M. P. Callaway and C. J. Rixey, Jr., both of Washington, D. C., on the brief), for petitioner Nashville, C. & St. L. Ry. Co.

Albert S. Brandeis, of Louisville, Ky. (William G. Dearing, of Lou-isville, Ky., on the brief), for petitioner Louisville & N. R. Co.

K. T. McConnico, of Nashville, Tenn. (Lee Douglas, of Nashville,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Tenn., and John A. Pitts, of Nashville, Tenn., on the brief), for intervening petitioners.

Blackburn Esterline, Special Asst. Atty. Gen. (Winfred T. Denison, Asst. Atty. Gen., on the brief), for the United States.

Charles W. Needham, of Washington, D. C., for the Interstate Commerce Commission.

William A. Wimbish, of Atlanta, Ga., for other intervening respondents.

Before KNAPP, Presiding Judge, and ARCHBALD, HUNT, CARLAND, and MACK, Associate Judges.

CARLAND, Judge.   This proceeding was instituted for the purpose of obtaining a judgment annulling an order of the Interstate Commerce Commission made on June 9, 1911, requiring the Louisville & Nashville Railroad Company, hereafter called the "L. & N.," and the Nashville, Chattanooga & St. Louis Railway Company, hereafter called the "N., C. & St. L.," to cease and desist for a period of two years from and after August 1, 1911, from granting to Nashville, Tenn., and to dealers in grain, grain products, and hay located at Nashville, the privilege of rebilling or reshipping grain, grain products, and hay from Nashville, so long as said railroads should refuse and refrain from granting said privilege of rebilling or reshipping grain, grain products, and hay to Atlanta, Columbus, Macon, Cordele, Albany, Valdosta, Dublin, Montezuma, Rome, and Athens, Ga., or either of them, and to the dealers in said commodities located in said cities.

The L. & N. owns and operates a line of railroad from Louisville, on the Ohio river, in Kentucky, to Nashville, Tenn., on the Cumberland river, and from Nashville to Birmingham and Montgomery.   Its rails do not reach Columbus, Macon, Cordele, Albany, Valdosta, Dublin, Montezuma, Rome, and Athens, Ga.   It has a line of railroad running from Louisville and Cincinnati to Atlanta, but does not reach Atlanta via Nashville.

The N., C. & St. L. owns and operates a line of railroad from Hickman, Ky., on the Mississippi river to Nashville, crossing the Tennessee river at Johnsonville, and from Nashville to Atlanta via Chattanooga.   Its rails do not reach Columbus, Macon, Cordele, Albany, Valdosta, Dublin, Montezuma, Rome, and Athens, Ga.   The rebilling or reshipping privilege condemned by the order of the Commission is as follows:

On grain, grain products, and hay shipped to Nashville by rail from or through Ohio or Mississippi river crossing points such as Louisville, Evansville, Hickman, Paducah, Cairo, etc., the L. & N. and N., C. & St. L. charge the full local freight rate from said crossing points to Nashville. These shipments may then be stopped at Nashville for a period not exceeding six months, during which time they may be rebilled or reshipped to destinations in Southeastern and Carolina territory; and on such reshipments so rebilled the freight charges

into and out of Nashville are readjusted, so that the total transportation charge on any one shipment from any given Ohio or Mississippi river crossing, via Nashville, to any given destination in said territory, shall exactly correspond with the transportation charge legally assessable·on that shipment had it been billed and moved through from its point of origin at the said Ohio or Mississippi river crossing points to its final destination without having been stopped in transit at Nashville.

In the case of W. S. Duncan & Co. et al. v. N., C. & St. L. Ry., 16 Interst. Com. Com'n R. 590, the Commission held this reshipment privilege above described to be an illegal device by which grain, grain products, and hay might be transported at less than the tariff rate applicable thereto, and also that it gave to Nashville an undue and illegal preference and advantage, and subjected other points in the Southeast to unjust and unreasonable prejudice and disadvantage. The order of the Commission, however, in the case cited, was held in abeyance until further consideration could be given to the general question of the validity of transit privileges. The·matter was further considered by the Commission, and in the case entitled "In the Matter of the Substitution of Tonnage at Transit Points," 18 Interst. Com. Com'n R. 280, the Commission refused to condemn transit privileges as such, but notified the carriers that such privileges must be carefully policed so that their use should not violate the law.

In view of the conclusion reached in the case last cited, the Commission cited the parties in the case of W. S. Duncan & Co. et al. v. N., C. & St. L. Ry. et al. to appear and show cause why the order theretofore issued therein should not be changed and modified so that it would require the defendants therein to cease and desist from discriminating in any respect whatever between Nashville, Tenn., and Atlanta, Columbus, Macon, Cordele, Albany, Valdosta, Dublin, Montezuma, Rome, and Athens, all located in the state of Georgia, and the shippers, consignees, and dealers, respectively, with respect to transit and reshipping privileges and practices as pertaining to grain, grain products, and hay, upon the ground that such discrimination was undue, unreasonable, and unlawful. After a full hearing on this order to show cause, the Commission made the order complained of in this proceeding.

The Commission, in concluding their report which resulted in said order, used the following language:

"After a careful consideration of all the pertinent facts and circumstances, we are of the opinion and find that the matters and things complained of herein constitute the undue and unreasonable preference and advantage and the undue and unreasonable prejudice and disadvantage as between the parties to this proceeding prohibited by section 3 of the act to regulate commerce."

[1] We may start, then, with the proposition admitted that the reshipping privilege existing at Nashville is not unlawful in itself or the Commission would not have framed the order in the alternative. Penn Refining Co. v. W. N. Y. & Penn. R. R., 208 U. S. 208, 28

Sup. Ct. 268, 52 L. Ed. 456. The discussion of the whole matter seems to be narrowed to two propositions: (1) Is the reshipping privilege existing at Nashville a violation of section 3 of the interstate commerce act with reference to the Georgia points mentioned in the order? (2) The Commission having found that it is a violation of said section, may this court review said finding? Section 3, above referred to, so far as material to the present inquiry, is as follows:

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The undisputed facts which gave rise to the establishment of the reshipping privilege at Nashville by the N., C. & St. L. in 1872 and by the L. & N. in 1877 are substantially as follows:

Nashville is located on the Cumberland river about 190 miles above its confluence with the Ohio river, and the Cumberland is navigable below Nashville for about nine months in the year. The navigable season corresponds with the season for the handling of grain crops. Atlanta is located 289 miles southeast of Nashville, and none of the Georgia points mentioned in the order of the Commission are on any navigable stream connecting them with the Mississippi, Ohio, or Cumberland rivers. Before there were any rail connections between Nashville and the river gateways, such as Cincinnati, Louisville, Evansville, Paducah, Cairo, Hickman, etc., and before there was even any rail connection between any of these river crossings and Atlanta and the Southeast, the Nashville & Chattanooga Railroad was completed from Nashville to Chattanooga as early as 1854. The cities of Charleston and Savannah contributed largely to the completion of this road and its connections with Atlanta and the seaboard for the purpose, expressed at the time, of connecting the cotton-producing section of the country with the grain fields of the West. The line from Charleston to Atlanta and Nashville was the first line, and was and still is the shortest line from the Southeast to the western grain country, and was completed before there was any other rail connection between Nashville and the Southeast on the one hand and Cairo, Evansville, Louisville, or Cincinnati on the other. The Nashville & Chattanooga Railroad, as soon as it was completed to Nashville, was the means by which grain and all western commodities were sent into the Southeast. All this traffic of necessity came from the Wabash, Ohio, and Mississippi rivers and up the Cumberland river by steamboat to Nashville, and was there loaded upon the cars of the Nashville & Chattanooga Railroad, the only rail line into the Southeast at that time.

This movement of grain caused Nashville at that early day to become the concentration point for grain moving through Nashville

as the first real gateway; and over the Nashville & Chattanooga Railroad as the first rail line into the Southeast having direct connections with the western waterways. Vast amounts of grain and other commodities were gathered in this way at Nashville by the boats of the Cumberland river, and transshipped by this first rail line to Atlanta and other points in southeastern territory. This was long before Cincinnati, Louisville, Cairo, or Paducah or any of the other river crossings were grain gateways or concentration points for this trade. There were no rail connections north or west of Nashville until the L. & N. finished its line between Louisville and Nashville in 1859.

At this time the L. & N. Railroad did not extend south of Nashville, and that road did not acquire any line south of Nashville until it leased the road from Nashville to Decatur in 1871, and completed the same to Montgomery in 1879. The Nashville & Chattanooga Railroad did not own a line west and north of Nashville until 1872, when it began to operate 171 miles of railroad running from Nashville west, crossing the Tennessee river at Johnsonville, Tenn., and going to the Mississippi river at Hickman, Ky. This road then became interested in the hauling of grain and other commodities all the way from the Mississippi and Ohio rivers on the west to Atlanta and southeastern territory. Prior to that time the Nashville & Chattanooga Railroad had no interest in how the grain came to Nashville from the Mississippi and Ohio rivers.

After the Nashville & Chattanooga Railroad became the owner of the line of road from Hickman to Nashville, it constructed and put in operation free elevators on the Tennessee river at Johnsonville and on the Mississippi river at Hickman, and by so doing sought to attract shipments of grain moving from the Mississippi and Ohio rivers to its 171-mile haul to Nashville, and then to carry it to the Southeast. It was found, however, that, notwithstanding the establishment of the free elevators at the points indicated, most of the grain from the Wabash, Mississippi, Ohio, and Cumberland river valleys continued to come into Nashville by boat on the Cumberland river. The boat and rail rate from the Wabash, Ohio, and Mississippi river grain-producing valleys, via Hickman and Johnsonville, to Nashville, was higher than the all-river rate accepted by the boats upon grain from these grain sections up to Nashville. The N., C. & St. L. Railroad was therefore obliged to take some steps to meet this situation in order to protect its railroad running from Nashville west, and to procure the longest possible haul from the grain-producing sections aforesaid to the grain-consuming territory in the Southeast.

The N., C. & St. L. Railroad could have done this in either one of two ways. It could have fixed and accepted a very low local rate from the river crossings up to Nashville, thus meeting the steamboat competition, or it could have established a through rate from the river crossings to the Southeast via Nashville, protecting this through rate by extending the privilege of reshipping at Nashville. It chose to follow the latter course in order better to subserve and protect its revenues. A very low local rate up to Nashville would have unnec-

essarily sacrificed revenue. This low rate would have been applicable to all the grain locally consumed at Nashville or points based on Nashville, and, if the road had unduly reduced the local rate up to Nashville to meet the steamboat competition, it would have been impossible to maintain the existing scale of rates on other commodities besides grain which were going to Nashville in large quantities for local consumption. This was the origin of the reshipping privilege which has existed for forty years at Nashville. It was caused by competition in the shipment of grain from the Mississippi and Ohio rivers by boat to Nashville on the Cumberland river.

The Cumberland river still exists, and Nashville is still located upon it. For all practical purposes, the situation, so far as competition on the Cumberland river is concerned, is the same potentially as it was in 1872. We must not deceive ourselves by believing that the L. & N. and the N., C. & St. L. extended this reshipping privilege to shippers and dealers at Nashville as a favor to the shippers and dealers or as a favor to Nashville. The simple truth is that the railroads extended the privilege to these shippers and dealers so as to obtain the shipment of grain from Mississippi and Ohio river crossings over their own lines.

The crucial question then is: Were the L. & N. and the N., C. & St. L. compelled to extend the reshipping privilege to grain dealers at Nashville in order to successfully compete with the transportation of grain, grain products, and hay on the Cumberland river? If they were, then the law of the land declares that the granting of the privilege to Nashville and not to Atlanta, where no such competition existed, would not·be a violation of section 3 of the act to regulate commerce.

We may not annul the order for the reason, if it be so, that Nashville ought to be classed and equalized with Mississippi and Ohio river crossings, nor may we annul it for the reason that Nashville is a natural concentration point or primary market for grain, if it be so, nor on the ground that Nashville is the proper place for stoppage of grain in order to protect the grain itself by handling and drying. We must annul the order, if at all, upon the ground that upon the undisputed facts the law declares that there is no violation of section 3 of the act to regulate commerce. We think that the undisputed facts demonstrate that the reshipping privilege was extended to shippers and dealers at Nashville on account of the competition on the Cumberland river, and on that account alone, and that the undisputed evidence would not support any other finding upon that proposition. It is alleged that the railroads bought into the situation at Nashville and therefore cannot be heard to say that they were compelled to meet the Cumberland river competition. This reasoning would prohibit the building of all railroads, as no one would build a railroad if it were to be held that all competition met in the operation of the same should be considered voluntary because the road had been voluntarily built. The unsoundness of such argument does not require demonstration.

In East Tennessee, Virginia & Georgia Railway Co. v. Interstate Commerce Commission, 181 U. S. 18, 21 Sup. Ct. 522 (45 L. Ed. 719), the Supreme Court, speaking of the section of the interstate commerce law involved in this case, used the following language:

"The prohibition of the third section, when that section is considered in its proper relation, is directed against unjust discrimination or undue preference arising from the voluntary and wrongful act of the carriers complained of as having given undue preference, and does not relate to acts the result of conditions wholly beyond the control of such carriers."

In the same case the Supreme Court said:

"The only principle by which it is possible to enforce the whole statute is the construction adopted by the previous opinions of this court; that is, that competition which is real and substantial and exercises a potential influence on rates to a particular point brings into play the dissimilarity of circumstance and condition provided by the statute and justifies the lesser charge to the more distant and competitive point than to the nearer and noncompetitive place, and that this right is not destroyed by the mere fact that incidentally the lesser charge to the competitive point may seemingly give a preference to that point, and the greater rate to the noncompetitive point may apparently engender a discrimination against it. We say seemingly on the one hand and apparently on the other, because in the supposed cases the preference is not 'undue' or the discrimination 'unjust.' This is clearly so, when it is considered that the lesser charge upon which both the assumption of preference and discrimination is predicated is sanctioned by the statute, which causes the competition to give rise to the right to make the lesser charge. Indeed, the findings of fact made by the Commission in this case leave no room for the contention that either undue preference in favor of Nashville or unjust discrimination against Chattanooga arose merely from the act of the carriers in meeting the competition existing at Nashville."

It is true that the language last above quoted was used in reference to the influence of competition on section 4 of the interstate commerce act before its amendment, but the same reasoning must apply with equal force to cases under section 3 for it has been uniformly held by the courts that the prohibition contained in section 4 is but one of the kinds of competition denounced by section 3. Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940; Interstate Commerce Commission v. Alabama Midland Railway, 168 U. S. 144, 18 Sup. Ct. 45, 42 L. Ed. 414; L. & N. R. R. v. Behlmer, 175 U. S. 648, 20 Sup. Ct. 209, 44 L. Ed. 309.

In the recent cases of Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 32 Sup. Ct. 22, 56 L. Ed. 83, and Peavey & Co. v. Union Pacific R. R. Co. (C. C.) 176 Fed. 423, it was held that the payment of an elevator charge by a railroad company which is compelled by competition is lawful. The Interstate Commerce Commission itself has in a large number of cases recognized competition, and especially water competition, as influential upon the establishment of reasonable rates. Commercial Club of Omaha v. Chicago Ry. Co., 7 Interst. Com. R. 404; Raworth v. Northern Pacific R. R. Co., 3 Interst. Com. R. 862; Chattanooga Board of Trade v. Southern Ry. Co., 10 Interst. Com. R. 133; E. Sondheimer Co. v. Ill. Cent. R. R. Co., 17 Interst. Com. Com'n R. 60; Bulte Milling Co. et al. v. Chicago & Alton R. R., 15 Interst. Com. Com'n R. 351;

Monroe Progressive League v. St. L., I. M. & S. Ry., 15 Interst. Com. Com'n R. 534; Indianapolis Freight Bureau v. P. R. R. Co., 15 Interst. Com. Com'n R. 567; Columbia Grocery Co. v. L. & N. R. R., 18 Interst. Com. Com'n R. 502.

[2] It is earnestly claimed, however, that, as the Interstate Commerce Commission found that this reshipping privilege at Nashville was a discrimination against Atlanta and the other Georgia points, this court is concluded by that finding. In the case of A., T. & S. F. Ry. Co. et al. v. Interstate Commerce Commission (Com. C.) 188 Fed. 229, this court said:

"In other words, as in this case, where all the facts are undisputed, we do not think the Commission can by an ultimate finding based upon the undisputed facts preclude this court from reaching a conclusion of its own upon such undisputed and admitted facts. When the facts are undisputed, there is no occasion for the facts to be found, and the ultimate conclusion of the Commission is a mixed question of law and fact which certainly ought not to be held to be conclusive upon this court."

Where the facts of a case are admitted and the question is what the judgment of a tribunal shall be upon such admitted facts, the case stands in the same position as if the facts had been found and the question should arise as to what should be the judgment upon the facts so found. This is always a question of law. So in the present instance, the facts being undisputed, the question arises whether these facts show a violation of section 3, and the solution of the question involves a consideration and interpretation of said section which is peculiarly a question of law and within the power of this court to decide.

In Interstate Commerce Commission v. Union Pacific R. R., 222 U. S. 541, 32 Sup. Ct. 108, 56 L. Ed. 308, it was said by the Supreme Court:

"There has been no attempt to make an exhaustive statement of the principles involved, but in cases thus far decided it has been settled that the orders of the Commission are final unless inter alia * * * (3) based upon a mistake of law."

Again, in the case of State of Washington ex rel. Oregon R. R. & Navigation Co. v. H. A. Fairchild et al., 224 U. S. 510, 32 Sup. Ct. 535, 56 L. Ed. ——, the question was presented as to whether, as a matter of law, the facts proved showed the existence of such a public necessity as authorized the taking of property, and the Supreme Court held in that case that the facts did not show the existence of such public necessity, although the Railroad Commission of the state of Washington had found otherwise. The Supreme Court cited the cases of Kansas City Railway Co. v. Albers Commission Co., 223 U. S. 573, 32 Sup. Ct. 316, 56 L. Ed. 556, Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 655, 32 Sup. Ct. 389, 56 L. Ed. 594, and Graham v. Gill, 223 U. S. 643, 32 Sup. Ct. 396, 56 L. Ed. 586, decided by that court.

Our conclusion in regard to the whole case is that under the facts appearing in the record the reshipping privilege at Nashville is not in violation of section 3, nor a discrimination in favor of Nashville as

against Atlanta and the other Georgia points, and that, the facts being undisputed, it is within the undoubted power of this court to so declare as a matter of law applicable to such a state of facts.

The order of the Interstate Commerce Commission complained of in this proceeding will therefore be annulled and the motion to dismiss denied. And it is so ordered.

HUNT, Judge, dissenting.