206 U.S. 142 (1907)
CINCINNATI, HAMILTON AND DAYTON RAILWAY COMPANY
v.
INTERSTATE COMMERCE COMMISSION.
No. 201.
Supreme Court of United States.
Argued January 31, 1907.
February 1, 1907.
Decided May 13, 1907.
APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.
Mr. Lawrence Maxwell, Jr., and Mr. Edward Colston for appellants.
Mr. L.A. Shaver and Mr. P.J. Farrell for appellee.
MR. JUSTICE WHITE delivered the opinion of the court.
Official Classification territory embraces that portion of the United States lying between Canada on the north, the Atlantic *143 Ocean on the east, the Potomac and Ohio Rivers on the south and the Mississippi River on the west. This territory includes what is known as Central Freight Association territory and Trunk Line territory, both being governed by the Official Classification. The Central Freight Association territory comprises the area west of Pittsburg and Buffalo, including the lower peninsula of Michigan and east of a line from Chicago to St. Louis, the Mississippi River from St. Louis to Cairo and north of the Ohio River. Trunk Line territory lies north of the Potomac River and east of Pittsburg and Buffalo. Whilst Official Classification governed throughout the whole of Official Classification territory, the rates throughout the whole of the Official Classification territory were not uniform because of a difference of rates prevailing in the subdivision, that is, in the Central Freight and Trunk Line territory. Thus although on shipments from points in the Central Freight Association territory to points in the Trunk Line territory or vice versa rates were the same for similar distances, yet on shipments between termini wholly within one or the other of these territories the rates varied because of the different rules governing rates which prevailed as to traffic exclusively moving in that particular territory.
The first classification adopted by the railroads to control in the territory above described as Official Classification territory was made contemporaneously with the going into effect of the act to regulate commerce, presumably to comply with that act, and took effect on April 1, 1887. From that date, until January 1, 1900, nineteen general classifications of freight, numbered from 1 to 19, were at various times adopted to govern in Official Classification territory. The articles embraced in these classifications were divided into classes, numbered from 1 to 6, the rate increasing as the number of the class decreased. From the beginning, until June 1, 1891, common soap in boxes in carloads was rated as fifth class, and fourth class for less than carloads. On the last-named date, in consequence of an order entered by the Commission on a complaint, as to the *144 classification of common soap in carloads, made by Procter & Gamble, soap manufacturers of Cincinnati, Ohio, soap in carloads was reduced to sixth class. This classification continued to govern until January 1, 1900, when a new classification, known as Official Classification No. 20, went into effect, by virtue of which soap in carloads was advanced from sixth to fifth class and soap in less than carloads was advanced from fourth to third class.
After the going into effect of Classification No. 20, the Procter & Gamble Company, successor of the firm of Procter & Gamble, complained to the Interstate Commerce Commission in respect to the alterations made in the classification of common soap. The petition recited the prior complaint by the firm of Procter & Gamble, and the making in 1890 of the order which led to the reduction from fifth to sixth class, heretofore referred to.
It was charged in the petition that in Official Classification No. 20 there had been an inequitable selection of particular articles and an increase in the rates upon such articles alone by the device of changing them from a lower to a higher class, for the sole purpose of increasing revenues to cover an alleged increase of cost of operation of the railroads, and that "by such course defendants have subjected and do thereby subject the said traffic in the articles changed, including common soap in carloads and less than carload lots, to an undue and unreasonable prejudice and disadvantage with respect to the traffic in all of the articles whose classification was not changed in Official Classification No. 20." It was further alleged as follows:
"If there are any qualities and conditions which, though not considered by defendants at the time of the adoption of said Classification No. 20, justify, nevertheless, the making of any or part of said changes, the same, at any rate, do not apply to common soap in carloads or less than carload lots. The same should, at least, have remained in sixth class in carload lots, as ordered by this Commission as aforesaid, and in fourth class *145 in less than carload lots, so as to maintain the proper relation and difference of rates between carload and less than carload lots. The changing of particular articles as aforesaid from lower to higher classes for the sole purpose of increasing the revenues of the railroads interested therein, is not a condition or circumstance justifying the said change of classification in common soap."
It was prayed that an order might be entered requiring the Cincinnati, Hamilton and Dayton Railroad Company and seven other named railroad companies, forming various connecting and joint lines of railroad in the territory governed by Official Classification No. 20, to "cease and desist from refusing to carry common soap in carload lots at sixth-class rates, and from refusing to carry common soap in less than carload lots at fourth-class rates." After the filing of the petition and before answer, Official Classification No. 20, was, in part, changed by making a new class, intermediate classes three and four for soap in less than carload lots and on some other articles, this class being determined by giving the articles in question the benefit of a reduction on the third-class rate of 20 per cent, provided the application of the 20 per cent reduction did not reduce the charge below the fourth-class rate, in which event the 20 per cent reduction should not be fully applied, but would only be applied to the extent necessary to make the rate not less than fourth class. The classification thus operating is spoken of as 20 per cent less than third class, but not less than fourth class, and we shall speak of it hereafter in this way.
In the answers filed the defendants in substance denied that common soap was improperly classified in Official Classification No. 20, originally or as modified, or that an unreasonable or unlawful rate was exacted for the carriage of soap, or that the defendants subjected the soap traffic to any undue or unreasonable prejudice, disadvantage or discrimination.
The taking of testimony was ended on September 26, 1900, and the report and opinion of the Commission was filed about *146 two and a half years thereafter, viz., on April 10, 1903. 9 I.C.C. Rep. 440. As respects putting carload soap in the fifth class, the Commission refrained both from deciding that the classification was unreasonable per se or that its reasonableness had been affirmatively established. It said:
"We regard the primary and controlling question in this case as a question of classification; that is, of relative rates, and dispose of it accordingly. In that view it is sufficient to hold that carload soap is not improperly placed in the fifth class, and that fifth-class rates therefore are not shown to be unlawful. So long as most articles entitled to as low rates as carload soap are put in the fifth class and required to pay fifth-class rates, we are not warranted, on the evidence before us, in condemning the same rating for that commodity. This disposition of the case, however, will not authorize the retention of carload soap in fifth class if the classification of other articles with which soap is compared should be reduced, nor will anything now decided preclude the Commission from holding, in an appropriate proceeding, that fifth-class rates in this territory are excessive."
In regard to the less than carload classification of common soap, after directing attention to the fact that such traffic had always been fourth class until January 1, 1900, the Commission said:
"A presumption that such rates are reasonable arises from the voluntary action of the carriers in keeping those rates in effect during such a long period, and that presumption has not been overcome, in our judgment, by the evidence presented in this case."
It was also found that certain rules set out in the findings governing carloads of mixed freight, permitting the carriage of the same at carload rates, coupled with the increase in the long standing less than carload rates on soap, operated a strong discrimination in favor of meat packers who manufactured soap, against manufacturers who were mainly engaged in manufacturing and selling soap. So also the Commission held *147 that the change as to the classification of soap in less than carload lots, besides involving the payment of higher rates for less than carload shipments, had brought about rate relations different from those previously existing between shippers of soap in Official Classification territory. Thus it was found that as a result of the new method of classification a shipper located at New York City could ship therefrom to practically all points in New England and a large number of points in New York State without paying higher than fourth-class rates, while a shipper located at Cincinnati could not ship northerly or northwesterly therefrom, more than about sixty miles, without paying an advance over fourth-class rates. The Commission expressly declared that "the difference of fifteen cents between fifth class and third class, which was in effect as between carload and less than carload shipments from January 1, to March 10, 1900," the time during which Official Classification No. 20 prevailed, before it was modified by the percentage reduction as to soap in less than carload lots "would plainly be excessive," and that the change operated by the percentage modification in question occasions a difference "which varies according to a given per cent, as applied to different scales of rates, appears to be inequitable and unjust, and the fact is so found."
In the order, as entered, the Commission dismissed so much of the complaint as referred to the classification of common or laundry soaps in carloads, and the defendants were "notified and required to cease and desist, on or before the 15th day of June, 1903, from charging, demanding, collecting or receiving for the transportation of common or laundry soap in less than carload quantities charges or rates per one hundred pounds, equal to twenty per cent less than rates fixed by them for the transportation of articles, designated as third class in their established freight classification, called and known as the `Official Classification,' which said twenty per cent less than third-class rates for the transportation of common or laundry soap in less than carloads are found and determined in and *148 by said report and opinion of the Commission to be in violation of the act to regulate commerce."
The railway companies not having complied with the order, this proceeding was commenced by the Commission in the Circuit Court of the United States for the Southern District of Ohio, under the direction of the Attorney General of the United States, to enforce compliance therewith. As respects the alleged unlawful character of the change in the classification of soap in less than carload quantities, it was charged in the petition as follows:
"And the petitioner charges that the action of the defendants in raising the classification of common or laundry soap in less than carload quantities, on December 29, 1899, from fourth class to third class, and subsequently, on March 10, 1900, changing the classification of common or laundry soap in less than carload quantities to twenty per cent below third-class rates, the same being more than fourth-class rates, was in violation of the act to regulate commerce; and petitioner further charges that the rates charged by the defendants since December 29, 1899, for the transportation of common or laundry soap in less than carload quantities are in violation of section 1 of the act to regulate commerce, in that they are unreasonable and unjust; and said rates are and have been in violation of section 3 of said act, in that said rates, based upon the classification aforesaid, give an undue and unreasonable preference or advantage to other descriptions of traffic, and subject common or laundry soap in less than carloads to an undue prejudice and disadvantage. The petitioner further charges that the change in classification by the defendants, made effective about December 29, 1899, whereby common or laundry soap in less than carload quantities was changed from fourth to third class, and the change in classification by the defendants, made effective March 10, 1900, whereby common or laundry soap in less than carload quantities was charged more than fourth-class rates, to wit, twenty per cent below third-class rates, were in violation of said act to regulate commerce, in *149 that said changes were unreasonable and unjust, and result in unlawful discrimination and prejudice against common or laundry soap in less than carload quantities, and against localities in Official Classification territory, wherein commodities are produced and transported, and against producers, shippers, dealers and consumers in said territory."
In the various answers filed issue was taken upon these averments without any intimation that any of the issues so tendered were improper to be raised.
The case was heard in the Circuit Court on the evidence before the Commission and on additional evidence taken by the defendants, principally directed to showing the extra cost incident to handling and transporting freight in general in less than carload lots. The complainant took no additional testimony. The Circuit Court decided in favor of the Commission (146 Fed. Rep. 559), holding that the evidence not only failed to justify the change of classification complained of, but established that the advance in rates caused by the increase in the classification of soap in less than carload quantities was not only unreasonable and unjust, but also resulted in an unlawful discrimination and preference between shippers. The case was then appealed to this court.
Before considering the fundamental question upon which the order of the Commission and the decree of the court enforcing it rest, we dispose of certain propositions relied upon by the railway companies, because to do so we think will clear the way for an analysis of the final question arising, stripped of confusing and irrelevant considerations. We think the Commission in making an investigation on the complaint filed by the Procter & Gamble Company had the power, in the public interest, disembarrassed by any supposed admissions contained in the statement of complaint to consider the whole subject and the operation of the new classification in the entire territory, as also how far its going into effect would be just and reasonable, would create preferences or engender discriminations; in other words, its conformity to the requirements *150 of the act to regulate commerce. And that such was the view taken as well by the railway companies as by the Commission during the course of the investigation before that body, is, we think, beyond doubt. Thus, on the examination of the very first witness called for the complainant before the Commission, counsel for the railway companies stated that in his opinion the pending investigation had "no significance except as preliminary to a judicial proceeding." And when at the threshold a question was raised in the examination of the same witness as to the competency of evidence on a subject not directly expressed in the complaint, but bearing upon the effect of the new classification, the Commission declared it was competent to show the general effect of such classification in the territory through which it operated. Our assent to this view of the power of the Commission conclusively, of course, also disposes of the contention that the court was without authority to determine the validity of the order of the Commission by the scope of the act to regulate commerce, because of an admission asserted to exist in the complaint originally filed before the Commission. It is needless, moreover, to say that the course of the proceeding before the Commission which we have stated, strips the case of any element of surprise or possible prejudice.
The Commission, as we have seen, did not find that the rate promulgated in Official Classification No. 20, as to soap in carloads, was unreasonable, preferential or discriminatory. From this it is elaborately argued that the order rendered by the Commission demonstrates its own error. This proceeds upon the following theory: For a number of years prior to 1891 soap in less than carloads was in the fourth class, and soap in carloads in the fifth class. By the order of the Commission, rendered in 1891, as we have seen, soap in carloads was put in the sixth class. By Official Classification No. 20 soap in carloads was moved up to fifth and soap in less than carloads from fourth to third class. The change made by the new classification destroyed the previous relation since the *151 difference between the rates governing third and fifth classes made by the new was greater than the difference between the fourth and sixth classes as obtaining in the prior classification. And this was one of the complaints made by the Procter & Gamble Company concerning the new Classification No. 20. The carriers, it is said, to meet this objection, adopted, after the complaint was filed, the modified classification of 20 per cent less than third class but not less than fourth class. The effect of this reduction, it is declared, was to cause soap in less than carloads to occupy just the same relative position to soap in carloads as it had occupied in the classification existing prior to the going into effect of Official Classification No. 20. And as the order of the Commission did not change the classification as applied to soap in carloads made by Official Classification No. 20, the proposition is that that body in holding the modified classification of 20 per cent less than third class and not less than fourth class to be illegal, destroyed the relation which the Commission had created by its former order, and which it was the purpose of the complaint of the Procter & Gamble Company to restore. But the argument takes for granted the very question for decision, that is, whether the modified classification of 20 per cent less than third class, but not less than fourth class, operated to continue the relation between soap in carloads and soap in less than carloads, which prevailed throughout Official Classification territory before the making of Official Classification No. 20. That the proposition thus begs the whole question, is demonstrated by the mere statement that both the Commission and the court below decided that Official Classification No. 20, as modified as to soap in less than carloads by the percentage order, was unreasonable, discriminatory, and by its effect created preferences among manufacturers and shippers of soap which had not existed prior to the new classification. When the real significance of the proposition is thus seen it amounts to this, that we must assume that both the court below and the Commission erroneously decided the controversy, and upon this mere assumption *152 proceed to reverse their action. But our duty, not to assume but to decide the case, cannot be thus obscured.
Laying aside, however, the questions of unreasonableness, of discrimination, and of preference and the consequent destruction, if these effects exist, by the new classification of the prior relation between soap in carloads and less than carload quantities, let us briefly consider the intrinsic merit of the proposition relied upon. It is that prior to Official Classification No. 20 there was a just relation between soap in carloads in class 6 and soap in less than carloads in class 4. Of course this admits that such just relation was destroyed by Official Classification No. 20 as originally put in force, since thereby soap in carload lots was placed in class 5 and soap in less than carloads in class 3, between which classes there was a greater difference relatively in rates than theretofore existed between the two commodities in the prior classification. This inequality the carriers declare was obviated after the complaint was filed, by the modified classification as to soap in less than carload lots of twenty per cent less than third class but not less than fourth class. By this means it is insisted the relation previously existing was recreated, and any disturbance engendered by Official Classification No. 20 was cured. Now, on the surface of things, the contradiction of the position is manifest. The modified rate on its face did not propose to put soap in less than carloads throughout the whole territory in a uniform class, but in the class which might result from the operation of a percentage basis controlled by whether or not the application of the percentage might or might not take soap out of one class and into another. In other words, it clearly contemplated that by the varying rates to which the percentage would be applied, soap in less than carloads would be left in portions of the territory in the fourth class and in a higher class in other portions. How, in view of this, it can be in reason conceived that the admitted uniform classification prevailing prior to the percentage rule could possible continue under a classification inherently wanting in uniformity, we fail to understand.
*153 But put the foregoing considerations aside. The complaint as to the order of the Commission is that it disturbed the previous relations between soap in carloads and less than carloads. What was the order? In effect it condemned and directed the carrier to desist from enforcing the modified percentage classification. At the worst view for the carrier the order complained of can only be taken as persuasively indicating  and such was the view intimated in the opinion of the Commission  the duty of the carriers to return soap in less than carloads to class 4, in which it had been uniformly placed prior to the going into effect of Official Classification No. 20. The real grievance which the railway companies must have reduces itself to this, that the order may lead to the putting of soap in less than carloads in class 4. But the very percentage basis which the carriers adopted contemplated that in some portions of the territory and somewhere the effect of the modification by a percentage reduction might be to put soap in less than carloads in the fourth class, else why the limitation, "but not less than fourth class contained in the modified classification.
We are thus brought to the fundamental question, which is, did the percentage classification lead to rates which were unreasonable, unjustly discriminatory or unduly preferential? If either was the result, the order directing the carriers to desist from enforcing the classification in question was proper.
We take up the related questions of discrimination and preference because the arising of such consequences from the classification more saliently appear, and because the demonstration of such results is in a measure elucidated by what we have previously said. Concerning the discrimination the Commission said:
"Whatever the effect of a percentage less than third class for less than carload shipments of other commodities, taking that rating under the classification, may be, it plainly works discrimination against complainant and other western shippers *154 of soap in less than carload lots, in favor of their competitors in the East, when the present situation is compared with that which existed under the old fourth-class rating, . . ."
And this finding was expressly concurred in by the Circuit Court. In pointing out the mode by which the modified classification operated, the result in question, the Commission said:
"These differences are due to variations in the scales of rates prevailing in the different sections. The twenty per cent less than third-class rating for less than carloads applies to all shippers of less than carload lots of soap throughout the entire territory, but it increases some rates more than others, and leaves some as they were before it was adopted. When, for example, under the application of that rule, the rate from Cincinnati to Boston is increased four cents, and the rate from New York to Boston remains the same, as compared with the fourth-class rates formerly in effect, it is plain that this method of determining rates upon a percentage basis operates unequally upon the different shippers of less than carload quantities in that territory."
The statute gives prima facie effect to the findings of the Commission, and when those findings are concurred in by the Circuit Court, we think they should not be interfered with, unless the record establishes that clear and unmistakable error has been committed. See Cin., N.O. & Tex. Pac. Railway v. Int. Com. Com., 162 U.S. 184, 194; Louisville, &c. Railroad Co. v. Behlmer, 175 U.S. 648, 672.
It is insisted that this is a case of that character. How, in reason, it is urged, can it be said that discrimination or preference, which did not before exist, was or could be produced from the mere application to the prior rates of a uniform percentage reduction? This, however, obscures the fact that the 20 per cent reduction was not uniform, but was that percentage less than third class, with the qualification "but not less than fourth class." In other words, the modified percentage reduction was not a fixed percentage, but was one which might *155 vary, depending upon the result which would be brought about by applying the rule. Putting, however, entirely aside this view, let us consider only the result of the working of the rule on the basis of 20 per cent less than third class. The factors to be considered are these; a, the relation existing prior to the going into effect of Official Classification No. 20; b, the operation of that classification over the whole of Official Classification territory; c, the percentage modification of 20 per cent less than third class as to soap in less than carloads, and also its operation over the whole territory; and, d, the varying rates of charges in the separate spheres into which the Official Classification territory was divided, viz., Central Freight Association territory and the Trunk Line territory. Now, testing the matter by these criteria, does it appear, as contended, that the findings of the Commission and the court, as to resulting preferences and discrimination, are so contradictory and erroneous that we should disregard them? The proposition that they were must rest upon the assumption that the application of a fixed percentage reduction to existing rates whilst it might vary them could not possibly change their relation. But this assumes that the variation which existed between rates in the different spheres of Official Classification territory was only a difference in the sum of the rate prevailing in one territory from that which prevailed in the other as to the same class. But this is a mistake, since there was also a difference in the two separate spheres of territory as to the margin of difference between the different classes of rates governing in the two territories. Thus there was in Central Freight Association territory not only a higher rate for commodities in the third class than prevailed in Trunk Line territory for the same class, but there was also in the Central Freight Association territory a wider difference between the rates governing commodities in the third class and those controlling commodities in the fourth class. It follows from this that where in any given case the 20 per cent reduction was applied to the increased rate which had arisen from having placed less than *156 carload soap in the third class, if the application of the full 20 per cent reduction was not sufficient to reduce the amount to the fourth class, the commodity would pay more than fourth class. In other words, although the commodity in the case stated would get the full benefit of the 20 per cent reduction from the third-class rate, as giving it that benefit did not reduce to the fourth-class rate the commodity would yet pay higher than fourth-class rate. It also follows that if in any case where the 20 per cent reduction was applied, if the result of applying it because of the narrowness of the difference between third and fourth class in that territory operated to reduce the same to the fourth class, the commodity would be left exactly in the class in which it stood before, that is, fourth class. By this it indubitably resulted that in a large degree in one of the subdivisions of the same classification territory soap in less than carloads remained in fourth class, and in the other took a higher class. And this illustrates the correctness of the findings of the Commission and of the court as to the preference resulting from applying to a territory governed by one classification a rule of percentage which, while assuming unity, produced diversity, and which, while asserting equality of class, engendered inequality. Of course, we confine our decision to the case before us.
And the views heretofore expressed serve also to dispose of the contention that, although it be conceded that discrimination and preference were created, yet the carrier should not have been ordered to desist from enforcing the modified percentage classification, because the discrimination and preference, if any, were not the result of the operation of that classification, and, moreover, were not repugnant to the act to regulate commerce, because they were simply the consequence of natural competitive advantages enjoyed by shippers in the sphere of the Trunk Line territory, which were not possessed by shippers in that other portion of Official Classification territory, known as Central Freight Association territory. But this simply involves a restatement of the misconception which we have *157 already pointed out. The discriminations and preferences which the Commission and the court below found to exist were results arising from the application to the conditions prevailing in Official Classification territory of the modified percentage classification. In other words, the order forbidding the enforcement of the modified percentage classification was based on the finding that that classification disturbed the rate relations theretofore existing in Official Classification territory and created preferences and discriminations which would disappear if the further enforcement of the changed classification was prevented.
This brings us to the final contention made on behalf of the railway companies, viz., that the order of the Commission was not lawful, because not within the power conferred by the act of Congress. This is, we think, largely disposed of by what we have previously said as to the nature and scope of the investigation which the Commission was authorized to make and the redress which it was empowered to give irrespective of the particular character of the complaint by which its power may have been previously invoked. Whatever might be the rule by which to determine whether an order of the Commission was too general where the case with which the order dealt involved simply a discrimination as against an individual or a discrimination or preference in favor of or against an individual or a specific commodity or commodities or localities, or as applied to territory subject to different classifications, and we think it is clear that the order made in this case was within the competency of the Commission, in view of the nature and character of the wrong found to have been committed and the redress which that wrong necessitated. Finding, as the Commission did, that the classification by percentage of common soap in less than carload lots operating throughout Official Classification territory, brought about a general disturbance of the relations previously existing in that territory, and created discriminations and preferences among manufacturers and shippers of the commodity and between localities in such *158 territory, we think the Commission was clearly within the authority conferred by the act to regulate commerce in directing the carriers to cease and desist from further enforcing the classification operating such results.
Affirmed.