**SHIELDS et al. v. UTAH IDAHO CENT. R. CO.**

No. 1558.

Circuit Court of Appeals, Tenth Circuit.

April 1, 1938.

BRATTON, Circuit Judge, dissenting.

———◆———

Wendell Berge, Sp. Asst. to Atty. Gen. (Robert H. Jackson, Asst. Atty. Gen., Leo. F. Tierney and Hugh B. Cox, Sp. Assts. to Atty. Gen., and Robert L. Stern, Sp. Atty., of Washington, D. C., on the brief), for appellant Shields.

Nelson Thomas, of Washington, D. C. (Daniel W. Knowlton, of Washington, D. C. on the brief), for appellant Interstate Commerce Commission.

J. A. Howell, of Ogden, Utah, and Robert E. Quirk, of Washington, D. C. (J. H. DeVine and David L. Stine, both of Ogden, Utah, C. D. Cass, of Washington, D. C., and Neil R. Olmstead, of Ogden, Utah, on the brief), for appellee.

Before LEWIS, BRATTON, and WILLIAMS, Circuit Judges.

LEWIS, Circuit Judge.

This case presents the issue whether appellee's railroad, on the procedure taken before the Interstate Commerce Commission prior to the institution of this suit or independently on the facts, was brought under and subjected to the Railway Labor Act of May 20, 1926, 44 Stat. 577, as amended by the Act of June 21, 1934, 48 Stat. 1185, 45 U.S.C.A. § 151 et seq., in its relations to and its dealings with its employes. Heretofore its employes have never been members of railway brotherhoods on steam railroad lines. They have had their own labor organizations on appellee railroad and through them they have dealt with appellee as to wages, hours and other conditions with which such organizations are usually concerned. That is true generally it seems with street, suburban and interurban railroads. Appellee company claims to be an interurban electric railway company, and it and its predecessor have operated as such for approximately 20 years. It is a Delaware corporation. The termini of its railway are Ogden, Utah, on the south and Preston, Idaho, on the north. Its mainline between those points is about 95 miles. It has two short branches. It carries freight, baggage, express and passengers. It passes through about fourteen towns and cities between Ogden and Preston. The four larger cities have a total population of 60,000. None of the others exceed 2,000. It runs frequent and rapid trains, both passenger and freight. It has restrictive franchises for its right to pass through the different towns and also franchises to operate on public highways in places. It has short sidings and spur tracks. It is standard gauge. It was built to develop and serve two valleys, a part of the Great Salt Lake Valley and the Cache Valley in northern Utah. It passes over the Wasatch Mountains to reach the Cache Valley and extends seven miles into Idaho. It makes frequent stops in serving the public in freight and passenger service, about one and a half miles apart on the average. Its owners built it to develop the resources of those valleys. Its grades and rails are not suited to steam railway trains. It and its owners have assisted in obtaining fruit and vegetable packing plants and canneries along its line. It has encouraged the production of sugar beets. It hauls these products to the plants and their output to steam railway lines for transportation to the general market. In summer some of its cars provide refrigeration and in winter heat. Its freight trains average six to seven cars, and its passenger trains less than two cars. Two high schools have buildings adjacent to its line, and it transports the students to and from them for a considerable distance. In 1926 it went into receivership in the United States District Court for Utah. A few years later it was taken out by reorganization and has since been operated in the same manner and in the same service that it had theretofore been operated. It was claimed and testified by those who have been closely connected with its operation for many years

that it could not be operated as a steam railway without being reconstructed, and that it could not continue to operate as it had been operated with the additional burdens that would be placed upon it if it be made subject to the Railway Labor Act, because of those burdens. The record gives an exhaustive comparison between this road and steam railroads and expenses of operating them. Appellee's general manager for the past 15 years, who had held a position with the Southern Pacific for eight years before that, testified in great detail to increase in labor cost to appellee if its road should be brought under the Railway Labor Act. He said:

"It would be unfair and impractical, and in addition to that, your honor, if applied would have produced an increase in the labor bill that would prohibit us from continuing in existence."

■■ Congress has full power of regulation over appellee. It has been an interstate carrier since the completion and operation of its road to Preston, Idaho. In its exercise of that power Congress may in its own judgment make different regulations applicable to interurban electric carriers from those applicable to steam carriers, or because of other material differences. It has done so, and that intention was exemplified in section 1, first, of the Railway Labor Act, as amended, 45 U.S.C.A. § 151, subd. 1. That section first gives a general definition of carriers subject to the Act, which is broad enough to include appellee, followed by the exempting proviso and then a grant of power to the Interstate Commerce Commission, thus:

"Provided, however, That the term 'carrier' shall not include any street, interurban, or suburban electic railway, unless such railway is operating as a part of a general steam-railroad system of transportation, but shall not exclude any part of the general steam-railroad system of transportation now or hereafter operated by any other motive power. The Interstate Commerce Commission is hereby authorized and directed upon request of the Mediation Board or upon complaint of any party interested to determine after hearing whether any line operated by electric power falls within the terms of this proviso."

■ The last sentence just quoted, conferring power on the Commission, was not in the original Act of May 20, 1926. It was added by amendment in 1934. It is plain that before the amendment appellee

was exempt from the Railway Labor Act, because it was not engaged in doing either of the things that would have made it subject to the Act. It continued after amendment to be a "line operated by electric power" and was not "operating as a part of a general steam-railroad system of transportation" etc. The Interstate Commerce Commission so found in its report on the hearing which it granted on the request of the Mediation Board. Among other things it said (Utah Idaho Central R. Co., 214 I.C.C. 707, 708): "This railway is operated by electric power, and none of its stocks or bonds are owned by any steam railroad. The only issue therefore is whether it is a street, interurban, or suburban railway within the meaning of the proviso." It further said: "It [appellee's railway] does not perform any intermediate service between other lines." This exhausted its power. Specifically, its only power was to determine "whether any line operated by electric power falls within the terms of this proviso." The proviso was not changed by the amendment, except, if at all, by enlargement of the words "any street, interurban, or suburban electric railway" to "any line operated by electric power." But the Commission misconceived, we think, the extent of its power by proceeding further. It closed its report by this finding: "that The Utah Idaho Central Railroad Company's lines do not constitute a street, interurban, or suburban electric railway within the meaning of the exemption proviso in the first paragraph of section 1 of the Railway Labor Act, as amended June 21, 1934." It did this on the proof before it that in the later years appellee's revenues for freight transportation had greatly exceeded its revenues for passenger transportation, and the Mediation Board accepted that finding as conclusive that appellee was thereupon brought under the Railway Labor Act in its relation with its employes. The Commission arrived at its conclusion solely on its own estimate of the facts and not because of any direct testimony that the line was not in fact an interurban electric railway. There was none, but there was direct, positive proof by at least one competent, qualified witness that it was and at all times has been an interurban electric railway.

Thereafter appellee filed its bill in the court below against Dan B. Shields, United States Attorney for the District of Utah, in which it sought among other things a writ enjoining Shields from prosecuting it

and its officers for claimed commission of crimes defined by the Railway Labor Act. The bill alleged that appellee brought the suit to prevent irreparable injury and damage to it and its business and property used in the transportation of persons and property and to restrain Shields individually and in his official capacity from threatened enforcement of fines and penalties under the Railway Labor Act; that appellee is engaged in the business of operating as a common carrier an electric interurban line of railway between Ogden City, Utah, and Preston, Idaho, for the transportation of passengers, baggage, freight and express between those points and intermediate points. There are allegations as to the construction of the road, first as street car lines in some of the cities through which it now passes and thereafter their acquisition, consolidation and extension northward over the Wasatch Range to Preston, Idaho.

Those who undertook the venture were of that section. They also planned the location of canneries, processing plants for preserving vegetables and fruits for the market, and other developments of the two valleys.

Shields answered denying that the road is an interurban electric railway. He alleged that the Railway Labor Act creates a board known as the National Mediation Board and gives it certain powers, among them the power and duty to prescribe the form of notice to carrier employes as set out in section 2, eighth, of the Act, as amended, 45 U.S.C.A. § 152, subd. 8, and that the board has prescribed the form of notice thus provided for, ordered that it be posted, and that if plaintiff-appellee fails to comply with said order and with certain other provisions of the Act it will be subject to prosecution for the penalties provided in the Act; that upon the request of that board proceedings were instituted before the Interstate Commerce Commission to determine whether appellee came within the proviso found in section 1 of said Act; that the Commission had held a hearing on that request. Appellee was there represented and introduced evidence, and on March 18, 1936, the Commission handed down its decision in which it held that appellee's lines do not constitute a street, interurban, or suburban electric railway within the meaning of the exemption proviso"; that the Commission's determination is controlling unless made arbitrari-

ly, is unreasonable or not based upon substantial evidence, and that the bill does not so allege; wherefore, he asked that injunctive relief be denied and the bill dismissed.

The Interstate Commerce Commission appeared in the District Court and filed petition to intervene as a defendant in the cause and to file answer and participate in the defense as fully as if named as a defendant. It was permitted to do so. The Commission alleged that pursuant to request of the Mediation Board made in accordance with the authority conferred on it by section 1 of the Act as amended it instituted a proceeding for the purpose of determining whether the Utah Idaho Central Railroad Company was either a street, interurban, or suburban electric railway; that it accorded appellee a full hearing and a large volume of testimony was taken; that it determined the matter and served copy of its report on appellee; that its report contains its findings that appellee's line of railway does not constitute a street, interurban, or suburban electric railway within the meaning of the exemption; that its finding is supported by evidence; that it was not arbitrary, unjust or contrary to the evidence or without evidence to support it; and that it did not exceed its authority. It denies certain allegations of unconstitutionality of the Act found in the bill.

The case went to trial in the District Court. At the close of the testimony, which was in substance a duplication of the testimony before the Commission, the Court made its findings of fact. A transcript of the testimony before the Commission was admitted in evidence before the Court. The Court reviewed the history of the road. It found that the resources of the territory traversed in the two valleys were wholly agricultural in character, and the only industrial development of which the territory has been and is capable is the construction and operation of processing plants to enable the products to reach the outside market, such as beet sugar factories, vegetable packing plants, milk condensing plants, pea canning plants, etc., and from the time of the construction of the interurban electric railway this industrial development has been fostered by collecting the raw products from the fields and delivering them to the processing plants located on its line, and delivering to those plants the necessary materials for such processing

from outside the territory served by the plaintiff, such as coal, lime, etc., by transporting by means of its interurban the processed products from the processing plants and delivering them to the steam railroads for transportation to the outside markets; that by means of its interchange with steam railroads wholly as an initiating or receiving carrier without discrimination as to preference as to which steam railroad is used, plaintiff has also fostered the agricultural development of the territory by delivering to the farms such needed merchandise from the outside, and delivering from said farms to the outside market such agricultural products as could be marketed without being processed; that it has likewise fostered the social development of the territory by the transportation to and from the farms to the larger communities of people inhabiting the territory and especially in the transportation of the school children; that to meet these needs of the people appellee operates short, rapid trains run at frequent intervals and making frequent stops, in many instances where no agents are maintained, for the transportation of both passengers and freight, practically to and from the individual farms and to and from the processing plants and community centers to enable the products to reach the market either as raw or processed products; that the physical elements of plaintiff's railway, its motive power, its equipment, track construction, length of spurs and sidings, and its curvature and grades require operation peculiar to interurban electric railways, and that without a complete change of its physical elements and structures it could not be operated as steam railroads are commonly operated; that it is operated by electric power, known as an interurban railway, and ever since its construction it has been known as such; that it is not now and never has been operated as a part of a general steam railroad system of transportation, and never has been any part of the general steam system of transportation operated by any other motive power; that none of its stocks or securities are owned by any steam railroad system of transportation or steam railroad company, nor do any of the officers or agents of such a company have any control or voice whatever in its management or operation; that the Mediation Board has prescribed the form of notice provided for in the eighth paragraph of section 2 of the Railway Labor Act, as amended, 45 U.S.C. A. § 152, subd. 8, and ordered that it be posted as therein specified thereby demanding that all employes be thereby notified that all disputes between the carrier and them will be handled in accordance with the provisions of said Railway Labor Act; that plaintiff has not complied with said order and if plaintiff continues to fail to comply with said order and otherwise fails to comply with the provisions of said Act it will subject itself to prosecution for the penalties therein fixed, notwithstanding it is not as an electric interurban railway subject thereto; that if it does not comply it thereby admits that it is subject to the provisions of the Railway Labor Act and thus voluntarily submits itself thereto, and it will thus suffer immediate and irreparable injury and damage; that such compliance will result in demands for increase of wages and demands for rules and working conditions with respect thereto which the plaintiff is unable to grant because its financial condition will not permit it so to do without immediately impairing and ultimately destroying its ability to continue to operate and serve the public in the manner in which it has served it in the past; that plaintiff has never had any disputes with its employes which have not been amicably adjusted and notwithstanding it has continuously operated under contracts with organizations of its employes, which are independent of it and in no wise under its control, as to pay, rules and working conditions, because they will be influenced to abandon their present organizations and to join those organizations of employes on transcontinental steam railroads throughout the country on the promise that they will receive the higher or so-called steam railroad standard wages and the different or so-called rules and working conditions prevailing thereon; that on the uncontradicted evidence in this cause as well as on the evidence before the Commission in its hearing the Court finds that plaintiff's railroad is operated by electric power, is known and is in fact now and ever since its construction has been an interurban electric railway as said term is used in and within the purview of said Railway Labor Act, and that the finding of the Commission that it is not such a railway is against and contrary to the law. The Court concluded as a matter of law that decree should go for plaintiff and directed the issuance of its writ permanently enjoining and restraining defendant Shields, both individually and as United States Attorney for the District of Utah, from initiating

or prosecuting any suit or suits against the plaintiff, its officers and agents based upon the alleged violation by them or any of them of any of the provisions of the said Railway Labor Act.

Paragraph eight of section 2, as amended, provides that the carrier shall notify its employes by printed notices in such form and posted at such times and places as shall be specified by the Mediation Board that all disputes between the carrier and its employes will be handled in accordance with this Act, and in such notices there shall be printed verbatim in large type the third, fourth and fifth paragraphs of section 2, thereby making them a part of the contract of employment between the carrier and its employes, and those paragraphs shall be a part of the agreement between employer and employes. The tenth paragraph of said section 2 makes it a misdemeanor on the part of the carrier, its officers and agents to refuse and willfully fail to comply with the terms of the third, fourth, fifth, seventh or eighth paragraphs of the section, and upon conviction the carrier, its officers or agents offending shall be subject to a fine of not less than $1,000 nor more than $20,000 or imprisonment for not more than six months, or both fine and imprisonment, and each day during which such carrier, its officers or agents shall willfully fail or refuse to comply with the terms of said paragraph shall constitute a separate offense. It also makes it the duty of the District Attorney of the United States to prosecute such offenses on the application of the carrier's employes.

There is one other point to be noticed. When appellee's predecessor came out of receivership a few years ago it was reorganized and transferred to appellee company. To satisfy the indebtedness of the old company the new company issued its mortgage bonds to the amount of $2,000,000 and 20,000 shares of stock. The old company had made periodic reports to the Commission, and the new company informed it of its stock and bond issue. Correspondence ensued, and directions were given to it by the Commission as to the manner of keeping its accounts, particularly in readjusting them in the light of the accounts kept by the old company. The new securities were issued in the belief that it was an interurban electric railway. Had they been issued under section 20a of the Interstate Commerce Act 49 U.S.C.A. § 20a without the approval of the Commission, they would have been

void. Paragraph (1) of said section, 49 U.S.C.A. § 20a (1), provides: "As used in this section the term 'carrier' means a common carrier by railroad (except a street, suburban, or interurban electric railway which is not operated as a part of a general steam railroad system of transportation)." See United States v. Chicago N. S. & M. R. Co., 288 U.S. 1, 7, 13, 14, 53 S.Ct. 245, 246, 248, 249, 77 L.Ed. 583. Nothing was said by the Interstate Commerce Commission in their correspondence upon the subject as to whether or not the securities of the new company could only be issued with its approval without being void. The Commission must have then been of the opinion that appellee was an interurban electric railway. The uncontradicted evidence shows that it has always been known as such by the public. In our opinion both law and equity are with appellee.

Affirmed.

WILLIAMS, Circuit Judge (concurring).

In Deitch v. Staub, 6 Cir., 115 F. 309, 312, section 1 of Act of Legislature of Tennessee, March 23, 1883, c. 163, was under consideration, which contained the following proviso: "Provided, that this act shall in no way apply to or affect corporations where suits have already been brought to declare their charters void, and shall have no effect on any kind of litigation or suits now pending against such corporation, for any purpose."

In the opinion of the court by Circuit Judge Lurton, afterwards justice of the Supreme Court of the United States, it is said: "The primary and usual office of a proviso is to except something out of a statute which would otherwise be within it. Its use is to take special instances out of a general class. Suth.St.Const. §§ 222, 223; Gibbons v. Ogden, 9 Wheat. [1] 191, 6 L.Ed. 23."

The effect of the proviso to section 1 of the Railway Labor Act is to except or exclude from the term "carrier" any street, interurban, or suburban electric railway, unless such railway is operated as a part of a general steam-railroad system of transportation, but not to exclude any part of the general steam-railroad system or transportation now or hereafter operated by any other *motive* power.

The inclusion of "any part of the general steam-railroad system of transportation now or hereafter operated by any other *mo-*

*tive* power" and the confining of the Interstate Commerce Commission to determine "after hearing" as to whether "any line operated by electric power falls within the terms of this proviso" restricts the Commission to the determination whether the Utah-Idaho Central Railroad Company, a street interurban or suburban *electric* railway, was operated as a part of a general steam-railroad system of transportation.

I concur in Judge LEWIS' opinion affirming the judgment of the lower court.

BRATTON, Circuit Judge (dissenting).

Section 1 of the Railway Labor Act, as amended, 48 Stat. 1185, 45 U.S.C.A. § 151, defines the term "carrier" to include any express company, sleeping-car company, carrier by railroad subject to the Interstate Commerce Act, and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad. Immediately thereafter is a proviso that the term thus defined shall not include a street, interurban, or suburban electric railway unless it is operated as a part of a general steam-railroad system of transportation, but shall not exclude any part of the general steam-railroad system of transportation then or thereafter operated by any other motive power. A provision follows that the Interstate Commerce Commission is authorized and directed upon request of the Mediation Board or upon complaint of any party interested, to determine after hearing whether a line operated by electric power falls within the terms of the proviso. The eighth paragraph of section 2, 45 U.S.C.A. § 152, subd. 8, provides that every carrier shall notify its employees by printed notices in such form and posted at such times and places as the Mediation Board shall specify that all disputes between the carrier and its employees will be handled in accordance with the terms of the act; and further that such notices shall contain verbatim the third, fourth, and fifth paragraphs of the section. The tenth paragraph provides that the willful failure or refusal of any carrier to comply with the terms of the third, fourth, fifth, seventh, and eighth paragraphs shall constitute a misdemeanor, and makes it the duty of any United States district attorney to whom a duly designated representative of the employees of a carrier may apply to institute and prosecute under the direction of the Attorney General necessary proceedings for the enforcement of the provision of the section.

Acting upon the request of the Mediation Board, proceedings were instituted before the Interstate Commerce Commission to determine whether plaintiff was an interurban electric railway within the meaning of the proviso contained in section 1. Following a full and fair hearing at which plaintiff was represented and introduced evidence, the Commission found and determined that the company was not such a railway. The Mediation Board then directed the company to post the formal notices prescribed in the eighth paragraph of section 2. It failed to comply with the order. Instead, it instituted this action against the United States attorney for the district of Utah, alleging at length that it was an interurban electric railway within the meaning of the exemption proviso and for that reason was not required to post the notices. It sought a declaratory judgment (1) that it was not a carrier as defined in the statute, but was an interurban electric railway, and (2) that it was not required to post the notices; and it sought an injunction restraining the United States attorney from instituting and prosecuting proceedings for violation of the act. The court found that, upon the evidence produced before the Commission, also upon the whole record made before the court, plaintiff was and is an interurban electric railway within the meaning of the exemption proviso; that the determination of the Commission that it was not such a railway was against and contrary to law; and that the United States attorney should be enjoined. But there was no express finding that the determination of the Commission was arbitrary, capricious, or unsupported by substantial evidence.

The Act of February 4, 1887, created the Commission and enumerated its functions. 24 Stat. 379. Section 14, 49 U.S.C.A. § 14 note, provided that its findings made in connection with reparation due an injured party should be prima facie evidence of the facts found in any judicial proceeding; and section 16, 49 U.S.C.A. § 16 note, provided that on a hearing in a judicial proceeding involving a lawful administrative order or requirement affecting a carrier, the report of the Commission should be prima facie evi-

dence of the matters therein stated. These sections were re-enacted without change in that respect in 1889, 25 Stat. 855, 49 U.S.C.A. §§ 14, 16, notes, and while they were in force the findings made in connection with administrative orders regulating rates, or concerning discriminatory practices or other similar matters affecting carriers merely had prima facie effect in judicial proceedings. Cincinnati, New Orleans & Texas Pacific Ry. Co. v. Interstate Commerce Commission, 162 U.S. 184, 16 S.Ct. 700, 40 L.Ed. 935; Louisville & Nashville R. R. Co. v. Behlmer, 175 U.S. 648, 20 S.Ct. 209, 44 L.Ed. 309; Cincinnati, Hamilton & Dayton Ry. Co. v. Interstate Commerce Commission, 206 U.S. 142, 154, 27 S.Ct. 648, 51 L. Ed. 995. But the language giving prima facie effect to the findings made in respect to such administrative orders was eliminated from section 16 when it was amended in 1906. 34 Stat. 584. And no identical or similar provision has found its way into later enactments.

The effect of a finding made by the Commission since that change is not open to doubt. It is held by repeated decisions that a determination of fact relating to rates, discriminatory practices, and similar matters affecting carriers is conclusive upon the courts if supported by substantial evidence, unless the action transcends the authority of the Commission or presents some other fatal irregularity. Interstate Commerce Commission v. Delaware, L. & W. R. R. Co., 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448; Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308; Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431; Atchison, Topeka & Santa Fe Ry. Co. v. United States, 232 U.S. 199, 34 S.Ct. 291, 58 L.Ed. 568; Los Angeles Switching Case, Interstate Commerce Commission v. Atchison, T. & S. F. R. Co., 234 U.S. 294, 34 S.Ct. 814, 58 L.Ed. 1319; United States v. Louisville & Nashville R. R. Co., 235 U.S. 314, 35 S.Ct. 113, 59 L.Ed. 245; Pennsylvania Co. v. United States, 236 U.S. 351, 35 S.Ct. 370, 59 L.Ed. 616; Manufacturers' Ry. Co. v. United States, 246 U.S. 457, 38 S.Ct. 383, 62 L.Ed. 831; Skinner & Eddy Corporation v. United States, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772; Seaboard Air Line Ry. Co. v. United States, 254 U.S. 57, 41 S.Ct. 24, 65 L.Ed. 129; New England Divisions Case, Akron R. Co. v. U. S., 261 U.S. 184, 203, 43 S.Ct. 270, 277, 67 L.Ed. 605; Western Paper

Makers' Chemical Co. v. United States, 271 U.S. 268, 46 S.Ct. 500, 70 L.Ed. 941; Virginian Railway Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463; Standard Oil Co. v. United States, 283 U.S. 235, 51 S.Ct. 429, 75 L.Ed. 999; Florida v. United States, 292 U.S. 1, 12, 54 S.Ct. 603, 608, 78 L.Ed. 1077. A finding made by the Secretary of Agriculture concerning maximum rates for stockyards has like binding effect. That results from section 316 of the Packers and Stockyards Act, 42 Stat. 159, as amended, 7 U.S.C.A. § 217, which provides that suits to restrain or annul orders of the Secretary are governed by the provisions relating to review of orders of the Interstate Commerce Commission. St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033. It is further settled that since the Shipping Act closely parallels the Interstate Commerce Act, each having created an administrative agency to whose informed judgment Congress committed the determination of questions of fact on the basis of which the making of administrative orders is authorized, a finding made by the Secretary of Commerce after the authority to administer the Shipping Act had been legally transferred to him is similarly binding. Swayne & Hoyt, Ltd., v. United States, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659.

The Interstate Commerce Commission is an administrative body of long experience in dealing with rates, classifications, discriminatory practices and other cognate matters relating to carriers engaged in interstate commerce. Congress enacted the Railway Labor Act with knowledge of that experience, and of the fact that the findings of the Commission made in connection with orders affecting such questions were conclusive upon the courts if supported by evidence, unless the action went beyond the authority of the Commission. With that background, Congress committed the determination of the question whether a railway is an electric interurban within the meaning of the exemption proviso in section 1, to the well-informed judgment and recognized discretion of that administrative agency. It certainly was not the legislative intent that the determination should be utterly impotent and without effect when challenged by a dissatisfied carrier in a judicial proceeding to restrain the institution and prosecution of authorized actions for refusal to comply with the act after the determination has been made. No such idle and fruitless con-

sequence should be lightly ascribed to the deliberate finding made upon careful examination and sifting of the facts by an informed agency of recognized discernment in that field, especially in wide departure from the effect of findings made by the agency under other enactments. On the contrary, the designation of the Commission as the agency to make the determination upon request of the Mediation Board or upon the complaint of any interested party, with requirement for a hearing, evinces a clear legislative intent by necessary implication that the determination should be conclusive unless it is arbitrary, capricious, or unsupported by substantial evidence, or the proceedings fall outside the authority of the Commission. Any other conclusion would be in sharp conflict with the recognized doctrine that a determination of facts made after hearing by an administrative agency clothed with power shall be final if supported by substantial evidence.

Where judicial review is invoked to determine whether a determination of the Commission or other administrative agency constitutes the confiscation of property, courts will exercise their independent judgment, but even in such circumstances appropriate regard should be given to the finding. St. Joseph Stock Yards Co. v. United States, supra. No question of that kind is involved here. The determination of the Commission was merely one of classification. Rates were not reduced, property was not valued, fair return was not fixed, and no other action of that kind was taken. The order of the Mediation Board merely directed the company to post the notices; it did not constitute confiscation of property. For that reason the case does not call for application of the rule requiring the exercise of the independent judgment of the court upon the question of fact submitted to the Commission.

Was the finding of the Commission arbitrary, or capricious, or made without substantial evidence to support it? The evidence presented little conflict. The line extending from Ogden to Preston is 94.63 miles in length, with two branches of approximately 7 and 14 miles, respectively. There are 36.93 miles of siding, spur, and yard tracks, making a total of 152.68 miles of standard gauge trackage, with 80 miles of 70-pound rail and 11 miles of 65-pound rail on the main line, 20 miles of 45 to 48-pound rail on the branches, and 26 miles of 48-pound rail on the sidings and spurs, the remainder varying from 40 to 85 pounds for comparatively short distances. The ties are 6 by 8 inches and 8 feet in length, spaced 2 feet between centers, and 11.3 miles of the main line are tie-plated. There are 70 places on the main line at which the grade breaks or changes. Outside the City of Ogden, the maximum grade is 2 per cent at several places for an aggregate of more than 18 miles, most of which is encountered in going over the Collinston Divide near the state line. The line makes a long circuit in going over the divide, and the sharpest curve on the main line is 12°. There are some curves on the spur tracks of 60° with a radius of 100 feet, and it is often necessary to switch the largest box cars one at a time on such curves, but there is no restriction there or elsewhere on steam-railroad freight cars. Steam locomotives could not operate safely over many of the sidings or spur tracks. The carrier owns five 50-ton and two 35-ton electric locomotives which are used to haul its trains. It also has three self-propelled cars which have been constructed and equipped for hauling package freight and can be used to haul other cars when necessary. The larger locomotives have practical ratings generally of 550 tons to 650 tons, which means that they can haul 12 to 14 cars averaging 45 tons each, except at two or three places where such ratings are only 5 to 8 cars upgrade. A helper engine is used occasionally, but that is not the usual practice. Electric power is purchased, and the company owns and uses four substations having capacities ranging from 500 to 1,000 tons of load on their respective sections of the line. The company owns 100 gondola cars, 22 ballast cars, 18 box cars, 14 flat cars, 12 stock cars, and 7 refrigerator cars; but only 98 of the gondola cars and 1 flat car are interchangeable with steam railroads. Most of the interchangeable traffic is handled in standard equipment furnished by connecting railroads. Interchange connections are maintained with all trunk lines reaching Ogden, with the Oregon Short Line at several places, and with the Bamberger Railroad Company at Ogden. The principal cities served, with their respective populations, are Ogden 40,272, Brigham 5,093, Logan 9,979, Preston 3,381, and 14 other cities or incorporated towns having a population ranging from 275 to 2,353. Eighteen per cent. of the trackage lies in public roads or public streets. These thoroughfares are occupied under county and mu-

nicipal franchises which in varying language provide that the motive power shall be electric energy and they contain other interurban limitations. The balance of the trackage is on private right of way. The line traverses the Great Salt Lake Valley and the Cache Valley, being agricultural sections. The passenger trains consist of one or two cars which are self-propelled; and they averaged 1.1 cars per train in 1934. Stops are made at 73 places for passengers, of which 52 are flag stops. The average capacity of its sidings is less; the length of its trains less; the number and frequency of trains greater; the cost of operation for enginemen and trainmen more; the grades heavier; and the curves sharper than those of steam railroads. During recent years the company has operated motorbus service parallel to its railway. In 1934, 408,634 passengers were carried, of whom 175,599 were students going to or returning from centrally located schools. The number of passengers transported by rail and the number by bus are not shown separately, but the daily average of trains was 11.5 and the daily average of busses was 4.1. The average fare paid ranged from 29.6 cents in 1931 to 20.7 cents in 1934. The passenger revenues declined every year since 1920. They were $448,184.01 in 1920, and only $61,346.25 in 1934, the reduction being due primarily to increased use of automobiles and paved highways. Interline tickets are not sold except in connection with other electric railways in Utah. Revenues from transporting baggage, mail, and express in 1934 were $39.48, $2,660.-30, and $5,931.50, respectively. The freight traffic consists to a very large extent in the transportation of sugar beets, milk, potatoes, and peas, moving to factories, canneries, or processing plants, and manufactured products outbound from such plants to connecting railroads. In 1934 the freight trains averaged 6.2 cars each, and the number of trains per day averaged 7.7. During the last half of that year, 6,354 carloads of freight were handled, 2,226 being local and 4,017 being interchanged with other carriers. Of the interchange traffic, 2,075 carloads moved to or from points in Utah, and 1,942 to or from points in other states. Traffic originating on the system moved to points in 31 states and traffic delivered to the company came from points in 26 states. Freight revenues have greatly exceeded passenger revenues in every year since 1918. They

were twice greater in 1926, three times greater in 1928 and 1929, four times greater in 1930 and 1931, five times greater in 1932, and more than six times greater in 1933 and 1934. In 1930 to 1934, inclusive, freight revenues were approximately 81.9 per cent. and passenger revenues 18.1 per cent. of the total revenues. The company is a party to practically all of the tariffs publishing through rates to or from that territory, and its interchange traffic generally moves on joint rates, but it does not perform any intermediate service between other lines. It had an average of 150 employees during the year 1934.

The Interstate Commerce Commission had occasion to determine in at least two instances prior to the enactment of the Railway Labor Act whether a given railroad was an electric interurban. It held that while other elements should be given appropriate weight, one of the major factors in making the determination is the ratio of revenue derived from the transportation of passengers to that derived from the hauling of freight, and that ordinarily where the latter substantially exceeds the former the railroad should not be classed as an electric interurban within the meaning of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. In re Proposed Control of Sacramento Northern Railway by W. P. R. R., 71 I. C. C. 653; Id., 79 I. C. C. 782; In re Application of Section 15a to Electric Rys., 86 I. C. C. 751. It must be assumed that Congress was familiar with these determinations and acquiesced in them when it provided in the Railway Labor Act that the Commission should determine upon request of the Mediation Board whether a given railroad is an electric interurban within the purview of the exemption proviso.

The question presented in Piedmont & Northern Ry. Co. v. Interstate Commerce Commission, 286 U.S. 299, 52 S.Ct. 541, 543, 76 L.Ed. 1115, was whether the company was an interurban electric railway. Its standard gauge tracks were constructed of 80-pound rails. Slightly more than 2 per cent. of the trackage was located in city streets and the balance was on private right of way; and the line usually went around cities rather than through them. The company owned 17 electric locomotives ranging in weight from 55 to 100 tons, and 287 freight cars which were regularly interchanged with steam railroads. Approximately 85 per cent. of the

total investment in equipment represented expenditures for locomotives and interchangeable freight cars used exclusively for the transportation of freight. Foreign line freight equipment of every kind flowed freely over the road. Freight trains usually consisted of 40 to 50 cars; and by doubling, 65 cars could be drawn in a train. Through and local freight trains were operated in the same manner as those of steam railroads. The company filed individual tariffs and it was a party to others. From the outset its freight revenues were large, while its passenger traffic progressively decreased. During the year ending June 30, 1929, its freight revenues were 94.5 per cent. and its passenger revenues were 2.9 per cent. of its total revenues. For 1929, 4.3 per cent. of the total freight revenue arose from local freight and 95.7 per cent. from interline freight. More than 80 per cent. of the freight moving over its line was interstate and less than 20 per cent. intrastate. It was held that the railway was of such importance in interstate commerce and rendered a service which was so predominantly devoted to the handling of interstate freight, and competed to such an extent with steam trunk line that it could not be said to be an interurban within the meaning of the provision in the Interstate Commerce Act in question. The controlling features which define an electric interurban and distinguish it from other types of carriers were delimited and blueprinted in this language: "No difficulty is encountered in defining a street or a suburban electric railway. These are essentially local, are fundamentally passenger carriers, are to an inconsiderable extent engaged in interstate carriage, and transact freight business only incidentally and in a small volume. The record indicates that prior to 1920 such street or suburban railways had grown in many instances so as to link distinct communities, and that, in addition, so-called interurban lines were constructed from time to time, to serve the convenience of two or more cities. But the characteristics of street or suburban railways persisted in these interurban lines. They also were chiefly devoted to passenger traffic and operated single or series self-propelled cars. Many of them carried package freight, some also transported mail, and still fewer carload freight picked up along the line or received for local delivery from connecting steam railroads. It is clear that the phrase 'interurban electric railway' was not, in 1920, commonly used to designate a carrier whose major activity was the transportation of interstate freight in trains of standard freight cars. It cannot be said, therefore, that, if a railway is operated by electricity and extends between cities paragraph (22), clearly and unequivocally exempts it from the Commission's jurisdiction."

It was held in United States v. Chicago North Shore & Milwaukee R. R. Co., 288 U. S. 1, 53 S.Ct. 245, 77 L.Ed. 583, that the carrier was an electric interurban within the meaning of section 20a of the Interstate Commerce Act, 49 U.S.C.A. § 20a, but there fast electric passenger traffic was the primary function of the carrier. Freight business was secondary and subsidiary when measured by car service and gross earnings. In 1930 and for several years prior thereto, about three-fourths of its revenue came from passenger traffic and about one-fourth from freight. The main terminals served only passenger and merchandise freight traffic. No facilities were maintained at the termini in Chicago and Milwaukee for receipt and delivery of carload freight. Connections for the interchange of such freight were provided outside those industrial centers. The facts there were substantially and decisively different from those presented here.

The majority take notice of the fact that agencies of the government have treated the company as an interurban electric road. The method of accounting prescribed for railways of that kind has been used without complaint from the Interstate Commerce Commission. The company sold an issue of bonds without securing approval of the Commission and no protest was made; and the Postmaster General has dealt with it as such a railway in respect to the transportation of mail. But administrative classification touching other matters is not decisive, Piedmont & Northern Ry. Co. v. Interstate Commerce Commission, supra; and inconsistency of the finding in question with those made on other occasions is not controlling. Virginian Ry. Co. v. United States, supra.

The finding of the Commission was not arbitrary, or capricious, or made without substantial evidence to support it. It is, therefore, conclusive upon the courts. The decree should be reversed.